OPINION OF THE COURT BY
JUSTICE NOBLE
This case presents two questions. First, does the Attorney General or an. individual member of the General Assembly have *359 standing to challenge the Governor’s actions as violating a statute or the constitution? The Court concludes that the Attorney General has standing but that the individual legislators in this case do not. Second, may the Governor reduce the amount of money made available to a state university under a legislative appropriation whether by revising the university’s allotment under KRS § 48.620(1), by withholding the allotment to the extent the university has adequate trust and agency funds under KRS § 45.253(4), or by otherwise requiring a state university not to spend appropriated funds? This Court concludes that the Governor does not have that authority. The judgment of the Franklin Circuit Court is thus reversed.
I. Background
Upon taking office in 2016, Governor Matt Bevin ordered an across-the-board 4.5% budget reduction for the executive branch in the fourth quarter of the 2015-2016 fiscal year. This reduction extended to the state’s nine institutions of higher education, which consist of several universities and the eonimunity college system (collectively, “the Universities”).
The Universities’ reductions were delineated in a letter to the Secretary of the Finance and Administration Cabinet and -the State Budget Director directing that their fourth-quarter allotments be reduced. The letter was dated March 31, 2Ó16- and stated in relevant part:
Pursuant to the authority provided to me in KRS § 48.620(1), this is to certify that the allotments for. the following budget -units of the Executive Branch for April 1, 2016 drawn-downs- [sic] by each unit under the 2015-2016 Executive Branch budget should be reduced by 4.5% of the-2015-2016 allotments:
• Eastern Kentucky University
• Kentucky State University
• Morehead State University
• Murray State University
• Northern Kentucky University
• University of Kentucky
• University of Louisville
• Western Kentucky University
• Kentucky Community and Technical College System • ■
On April 19, 2016, the Governor sent another letter, again to the Secretary of the Finance and Administration Cabinet and the State Budget Director. This letter recounted the previous letter’s contents and then ordered “pursuant to the same statutory authority that the 2015-2016 allotments to each ... institution! ] should be further revised.” As to Kentucky State University, the 4.5% reduction was' restored. As to the other eight institutions, the letter ordered that their budget reductions be amended from 4.5% to 2%.[1]
The Attorney General filed a declaratory-judgment action against the Governor, the State Budget Director, the. Secretary of the Finance and Administration Cabinet, and the State Treasurer challenging this action,[2] Three members of the House of Representatives joined as intervening *360 plaintiffs. By agreed order, the funds at issue were placed in a separate account and were “recorded as a disbursement of FY 2016 appropriations but w[ould] not be transferred until further order of the Court at which time the funds w[ouId] be disbursed to the institutions or returned to the Commonwealth’s general fund.”
The Governor moved to dismiss the case, claiming both that the Attorney General and the legislators lacked standing and that his actions were legal. As to the latter claim, he relied primarily on two statutes, KRS § 48.620(1), which was cited in his letters, and KRS § 45.258(4). He claimed that KRS § 48.620(1) allowed him to reduce the “allotments” to the Universities without changing the legislative appropriations. He claimed that KRS § 45.258(4) allowed him to withhold appropriations until the Universities had spent their trust and agency funds (that is, funds generated by tuition, etc.). The statutes combined, he claimed, gave him “great discretion” in whether to provide the appropriated funds.
The Attorney General disputed that KRS § 48.620 gave the Governor such broad authority and argued that any such reading of the statute would violate the separation-of-powers doctrine and constitute an improper delegation of authority by the General Assembly. The Attorney General also claimed that the Governor’s actions would unlawfully suspend the budget bill and that KRS § 45,253(4) did not apply to the Universities, which had elected to operate under KRS Chapter 164A.
The Franklin Circuit Court concluded that the Attorney General had standing to bring the suit, but nevertheless granted summary judgment in the Governor’s favor on the merits. The court concluded primarily that KRS § 48.620(1) and KRS § 45.253(4) delegated the authority “to address budget concerns within the executive branch.” Specifically, the court concluded that these “statutes ... grant [the Governor] the authority to revise downward the Universities’ allotments.” The court also stated: “The Universities ... are under the Governor’s control as part of the executive branch,” at least in the context of the budget bill. The court concluded that the Governor’s actions did not violate Kentucky’s strict separation-of-powers doctrine. In this respect, the court concluded that the allotment revision was not, in fact, a reduction in the appropriation by another name, and was instead an exercise of legislatively granted power. Finally, the court concluded that there remained a check on the Governor’s power, in that the judiciary could “realign! ] the balance of power” if he “purports to wield divine power over another branch, or even over a division, cabinet or program within the executive branch, to the point that funding levels reached constitutionally impermissi-bly low levels.”
The Attorney General and the House members filed notices of appeal and a motion to transfer the case from the Court of Appeals to this Court. That motion was granted, and thus the appeal is before this Court.
II. Standing
Before reaching the merits of this dispute, this Court must address the claim that the Attorney General and intervening state representatives lack standing to prosecute this action. We answer this question first because if neither the Attorney General nor the individual legislators have standing to challenge the Governor’s actions, then we would be left with a non-justiciable cause of action, which would call for dismissal without addressing the merits. See, e.g., Lawson v. Office of Att’y Gen., 415 S.W.3d 59, 67 (Ky.2013) (“‘Standing,’ of course, in its most basic *361 sense, refers to an integral component of the ‘justiciable cause’ requirement underlying the trial court’s jurisdiction.” (citing Ky. Const. § 112; Rose v. Council for Better Educ., 790 S.W.2d 186 (Ky.1989))).
A. The Attorney General has standing to seek declaratory and injunctive relief to vindicate the public interest against alleged unauthorized and unconstitutional actions of the Governor.
To have standing to sue in Kentucky, the basic rule is that the person must have a “judicially recognizable interest-in the subject matter of the suit.” E.g., Ashland v. Ashland FOP No. 3, 888 S.W.2d 667, 668 (Ky.1994). Does the Attorney General have such an interest in the Governor’s reductions of the Universities’ budgets?
At the outset, the Attorney General argues that this Court’s holding in Commonwealth ex rel. Conway v. Thompson, 300 S.W.3d 152 (Ky.2009), on the issue of the Attorney General’s standing to sue other executive branch officials for declaratory and injunctive relief, should control outright without need for further analysis. In that case, we overruled our prior decision in Commonwealth ex rel. Cowan v. Wilkinson, 828 S.W.2d 610 (Ky.1992), to the extent that it required the Attorney General to have a “personal interest” in the outcome of the case to have standing. Thompson, 300 S.W.3d at 172-74. In doing so, we “state[d] categorically ... that the Attorney General of the Commonwealth of Kentucky has standing to seek injunctive relief on behalf of the citizens of the Commonwealth.” Id. at 172. That was because “the Attorney General ha[d] a sufficient personal right in these' types of cases by virtue of the office and the duties commensurate with that high office.” Id. at 173 (emphasis added).
That italicized language, clarifying our holding in Thompson, is indeed the key to unlocking the issue of the Attorney General’s standing in this case. Further analysis, however, is required to determine whether in this case duty calls upon the Attorney General (and, thus, confers on him standing) to vindicate the public rights of the people of the Commonwealth. As we explain below, guided by history and precedent, we conclude that it does.
As we alluded in Thompson, the Attorney General’s standing is dictated by the powers and duties of that office. Under the Kentucky Constitution, the Attorney General is an elected constitutional officer whose “duties ... shall be such as prescribed by law.” Ky. Const. § 91; see also id. § 93 (“The duties and responsibilities of the[] [constitutional] officers shall be prescribed by law_”). The General Assembly has prescribed the Attorney General’s duties and responsibilities in KRS § 15.020, which in relevant part provides:
The Attorney General is the chief law officer of the Commonwealth of Kentucky ... and shall exercise all common law duties and authority pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment. ... [H]e shall appear for the Commonwealth in all cases in the Supreme Court or Court of Appeals wherein the Commonwealth is interested, and shall also commence all actions or enter his appearance in all cases, hearings, and proceedings in and before all other courts, tribunals, or commissions in or out of the state, and attend to all litigation and legal business in or out. of the state required of him by law, or in which the Commonwealth has an interest ....
Whether the Attorney General has the power to bring a given action on behalf of the people of the Commonwealth (at least where there is no statute governing *362 the subject) turns on whether that action falls under the “common law duties and authority pertaining to the office of the Attorney General under the common law,” and whether the action is one “in which the Commonwealth has an interest.” KRS § 15.020.
Historians, scholars, and jurists agree that clearly defining the Attorney General’s common-law duties is not easily done. See generally Comm, on the Office of Att’y Gen., Nat’l Ass’n of Att’ys Gen., Common Law Powers of State Attorneys General 13-19 (Jan. 1975) (summarizing historical commentary and judicial holdings on the common-law powers of the Attorney General).[3] An exhaustive definition of the Attorney General’s common-law powers and duties is not required today. Instead, it suffices to analyze the parameters of that office’s prerogative to seek, on behalf of the people, injunctive relief against other government actors when the Commonwealth has an interest in the case.
To begin, we reiterate: “It is unquestioned that ‘[a]t common law, [the Attorney General] had the power to institute, conduct and maintain suits and proceedings for the enforcement' of the laws of the state, the preservation • of order, and the protection of public rights.’” Thompson, 300 S.W.3d at 173 (alterations in original) (quoting Commonwealth ex rel. Hancock v. Paxton, 516 S.W.2d 865, 867 (Ky.1974)). Significantly, the Attorney General was empowered under the common law to bring any action thought “necessary to protect the public interest.” Id. (quoting 7 Am. Jur. 2d Attorney General § 6 (2009)). Indeed, the Attorney General has not only the power to bring suit when he believes the public’s legal or constitutional interests are under threat, but appears to have even the duty to do so. Cf. Wilkinson, 828 S.W.2d at 618 (Leibson, J., dissenting) (“It is the Attorney General’s responsibility to file suit to vindicate-public rights, as attorney for the people of the State of Kentucky.”). And, notably, this “broad grant of authority ... includes the power to act to enforce the state’s statutes.” Thompson, 300 S.W.3d at 173 (quoting 7 Am. Jur. 2d Attorney General § 6 (2009)).
It is widely recognized that the Attorney General’s common-law authority to represent the interests of the people derives from the broad powers that office initially possessed in representing the legal interests of the English crown. As one former Attorney General succinctly explained:
As guardian of royal prerogative, the Attorney General of England possessed a broad range of powers. ... [WJhen state governments were organized and recognized in this country, there was no monarch in whom the government prerogatives were vested. Since the essential power of government resided and emanated from the people, the prerogatives had to be exercised on their behalf. Just as the Attorney General safeguarded royal prerogatives at common law, similarly, the official authority, an obligation to protect public rights and enforce public duties on behalf of the general' public, became vested by the states in the Attorney General. And it is this obligation inherited from the common law to represent the public interest which has shaped and colored the role which the Attorney General fulfills today.
Common Law Powers of State Attorneys General, supra, at 2 (quoting Arthur Sills, Proceedings of the Conference of the Nat’l *363 Ass’n of Att’ys Gen. 102 (1967)). Based on that widely accepted understanding of the nature of the.Attorney General’s inherited prerogatives, it is clear that the Attorney General has a judicially cognizable interest here, namely, in fulfilling his common-law obligation to protect public rights and interests by ensuring that our government acts legally and constitutionally.
Our predecessor court long ago recognized and adopted this view of the Attorney General’s authority. Indeed, that court stated:
[T]he source of authority of the Attorney General is the people who establish the government, and his primary obligation is to the people. ... The Attorney General, as chief law officer of this Commonwealth, charged with the duty of protecting the interest of all the people ... had such a vital interest in this litigation that he had a right to intervene at least insofar as the public issues advanced in the action were involved.
Hancock v. Terry Elkhom Mining Co., 503 S.W.2d 710, 715 (Ky.1974); accord Paxton, 516 S.W.2d at 867 (“But under the democratic form of government now prevailing the people are the king,- so the Attorney General’s duties are to that sovereign rather than to the machinery of government.” (citation omitted)). Our predecessor court made clear that KRS § 15.020, “in stating at the outset that the Attorney General is ‘the chief law officer of the Commonwealth,’ intends that in case of a conflict of duties the Attorney General’s primary obligation is to the Commonwealth, the body politic, rather than to its officers, departments, commissions, or agencies.” Paxton, 516 S.W.2d at 868. Thus, in addition to the unquestioned “right of the Attorney General to appear and be heard in a suit brought by someone else in which the constitutionality of a statute is involved,” id. (citing CR 24.03; KRS § 418.075),[4] the Court held that the Attorney General’s “constitutional, statutory and- common law powers include the power to initiate a suit questioning the constitutionality of a statute,” id.
The holding in Paxton thus leads to an inevitable conclusion: If the Attorney General has the power to initiate a suit questioning-the constitutionality of a statute, he must also have the power to initiate a suit questioning the constitutionality or legality of an executive action. There are no grounds for treating allegedly unconstitutional executive actions differently from allegedly unconstitutional legislative actions. It is certainly in “the interest of all the people” that there be no unconstitutional or illegal governmental conduct. And standing must be determined at the beginning of an action, not retrospectively after the merits have been sorted out.
A plain reading of Thompson and Pax-ton and other authorities thus establishes that the Attorney General has standing to bring this action questioning the authority for and constitutionality of the Governor’s actions.
The Governor, however, argues that the Attorney General’s authority and standing to bring suit in the public interest should be limited to only those eases where there are no identifiable parties with particularized injuries (such as the Universities in this case). In support of this position, he cites Johnson v. Commonwealth ex rel. Meredith, 291 Ky. 829, 165 S.W.2d 820 (1942), for the proposition that by enacting KRS § 12.210, which authorizes state agencies to hire outside counsel, the Gen *364 eral Assembly acted to limit the Attorney General’s common-law power.
This is an overreading of Johnson. That case answered only whether the legislature “may withdraw [discrete common-law] powers and assign them to others or may authorize the employment df other counsel for the departments and officers of the state, to perform them.”. Id. at 829. In other words, Johnson signed off on the General Assembly’s authority to divest some of the powers of the Attorney General (i.e., serving as legal counsel to a given state entity) and invest them in another (i.e., private counsel of the entity’s choosing). It. did not hold, as the Governor states, that “when a state agency hires, or can hire,- its own attorneys pursuant to statutory authority, the Attorney General no longer has authority to unilaterally decide to act for that agency.” To the contrary, Johnsmi explicitly left that question open:
As to what extent [KRS § 12.210] should be construed as affecting the supremacy of the Attorney General as the chief,law.officer of the .Commonwealth, or to what extent it deprives him of the power and right to represent the Commonwealth as a distinct entity in litigation in which any of the departments employing counsel are involved, or in any other respect, we express no opinion, for they are questions not presented in this suit.
Id. at 829. Indeed, our predecessor thought it sufficient to express only its “opinion that the Act does not deprive the Attorney General of his hereditary and statutory prerogatives to the extent or degree that it can be said that he is left without substantial duties, responsibilities and rights.” Id. KRS § 12.210, as interpreted by Johnson, is not nearly the limitation on the Attorney General’s authority as the Governor claims.
But the “supremacy of the Attorney General as the chief law officer of the Commonwealth” is squarely before us here. The simple answer is that delegating day-to-day operational powers—in this case, to the Universities’ own counsel— does not preclude a need for the Attorney General to protect “the interest of all the people” when unconstitutional or unlawful conduct is claimed either by or toward those universities. The Governor’s invitation to so constrain the traditional powers and duties of the Attorney General to protect the interests of the people of the Commonwealth could result in unconstitutional or unlawful conduct that would go unaddressed, against the interest of the people, if the Universities and their counsel for political, financial, or other reasons chose not to seek redress.
 There is no valid justification for cutting off the “hereditary” prerogative of the Attorney General to challenge the legality and constitutionality of a state action merely because the state actor has (or could) employ other legal counsel. Indeed, the words of our predecessor in Paxton, by extension, ring just as true here as they did there: “We think that if the Constitution is threatened by an item of legislation [or act of the Executive], the Attorney General may rise to the defense of the Constitution by bringing a suit, and is not required to wait until someone else sues.” 516 S.W.2d at 868. Likewise, the Attorney General must defend duly adopted statutory enactments that are not unconstitutional.
In fact, the soundness of this position becomes even more apparent in light of the realities (and costs) to public entities of challenging executive or legislative actions. The ongoing functions of such entities and the costs of such litigation, in money and political good will, could make a legal challenge prohibitive despite whatever dis *365 agreement they may have with a Governor’s or legislature’s action. Because the Attorney General is the chief law officer of the Commonwealth, he is uniquely suited to challenge the legality and constitutionality of an executive or legislative action as a check on an allegedly unauthorized exercise of power. Cf. State ex rel. Sorensen v. State Bd. of Equalization, 123 Neb. 259, 242 N.W. 609, 610 (1932) (“[T]he Attorney General has the right, in cases where ... the interests of the public are directly concerned, to institute suit ... for their protection. The state is not left without redress in its own courts, because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer, on whom it has cast the responsibility, and to whom, therefore, it has given the right of appearing in its behalf and invoking the judgment of the court on such questions of public moment.”); Comment, An Attorney General’s Standing before the Supreme Court to Attack the Constitutionality of Legislation, 26 U. Chi. L. Rev. 624, 631 (1959) (“[T]he basic constitutional principle that the judiciary is to serve as a check on the legislature would be avoided unless the Attorney General is granted standing to present the constitutional question concerning legislation which seriously jeopardizes the interests of the government as a whole.”).[5]
This view of the authority of the Attorney General is in line with that taken by most of our sister jurisdictions. Indeed, the facts of a fairly recent case from South Carolina are notably similar to the facts presented here. In State ex rel. Condon v. Hodges, 349 S.C. 232, 562 S.E.2d 623 (2002), the South Carolina Supreme Court upheld the power of the Attorney General to sue to enjoin the Governor from circumventing provisions of an appropriations bill. Noting that “[t]he way in which public funds are handled.- and whether a violation of the separation of powers doctrine has occurred are clearly questions in which the State has an interest,” id. at 627, the South Carolina Supreme Court, held that “the Attorney General has the authority to sue the Governor when he is bringing the action in the name of the State for the purpose of asserting that a separation of powers violation has occurred,” id. at 628. See also id. (“[T]he Attorney General can bring an action against the Governor when it is necessary for the enforcement of the laws of the State, the preservation of order, and the protection of public rights.”).
And courts in numerous other states have reached similar conclusions about the powers and .duties of the Attorney General. See, e.g., State ex rel. Landis v. S.H. Kress & Co., 115 Fla. 189, 155 So. 823 (1934); People ex rel. Scott v. Illinois Racing Bd., 54 Ill.2d 569, 301 N.E.2d 285 (1973); Lund ex rel. Wilbur v. Pratt, 308 A.2d 554 (Me.1973); Jacobson v. Parks & Rec. Comm’n, 345 Mass. 641, 189 N.E.2d 199 (1963); Att’y Gen. v. Trustees of Boston Elevated R.R. Co., 319 Mass. 642, 67 N.E.2d 676 (1946); Fordice v. Bryan, 651 So.2d 998 (Miss.1995); State ex rel. Douglas v. Thone, 204 Neb. 836, 286 N.W.2d 249 (1979); State ex rel. Meyer v. Peters, 188 Neb. 817, 199 N.W.2d 738 (1972); Hetherington v. McHale, 10 Pa.Cmwlth. 501, 311 A.2d 162 (Pa.1973); Yett v. Cook, 281 S.W. 837 (Tex.1926); Hansen v. Barlow, 23 Utah 2d 47, 456 P.2d 177 (1969). Of the minority of states that have ruled oth *366 erwise, their Attorneys General are typically invested with no common-law powers. See, e.g., State v. Rankin, 282 N.E.2d 851 (Ind.1972); State v. Burning Tree Club, 301 Md. 9, 481 A.2d 785 (1984). In contrast, Kentucky’s Attorney General is expressly given such powers by statute.
Finally, we find particularly apt the following comments by Justice Erwin of the Florida Supreme Court:
The Attorney General is elected by the people; he is entrusted by them with the common law power to legally represent them or some of them in matters deemed by him to affect the public interest. He has a discretionary duty under the common law rarely modified by statute to protect the public interests of any of the people who elected him.
It is his discretionary duty to choose those legal matters in the area of public litigation or quasi-judicial administration in which he believes it is his official duty to intervene, except in those instances when it is mandated by the legislature for him to intervene or to refrain from intervening. If he is mistaken in his legal advocacy, the courts and quasi-judicial tribunals always retain the power to rule against him and often do on the merits but this power does not affect his standing to become a party of interest in the cause or proceeding. Regardless of the effectiveness of his efforts in particular public legal situations, at least the people have the continuing satisfaction of knowing that their elected Attorney General has the right to exercise his conscientious official discretion to enter into those legal matters deemed by him to involve the public interest, even though not expressly authorized by statute. The presumption is that he will not enter strictly private litigation and a great degree of latitude must of necessity be extended to him in the exercise of his right- to intervene in behalf of public interests.
State ex rel. Shevin v. Yarborough, 257 So.2d 891, 895 (Fla.1972) (Erwin, J., specially concurring); see also Mundy v. McDonald, 216 Mich. 444, 185 N.W. 877, 880 (1921) (“A broad discretion is vested in [the Attorney General] in determining what matters may, or may not, be of interest to the people generally,”).
In the end, we are left with only one conclusion: the Attorney General, as chief law officer of Kentucky, has broad authority to sue for declaratory and in-junctive -relief- against state actors, including the Governor, whose actions the Attorney General believes lack legal authority or are unconstitutional. It is that power which the Attorney General-has invoked to support bringing the present action—to wit, the Attorney General seeks to enjoin the Governor’s reductions of the final quarterly allotments of the Universities’ 2015-2016 appropriations as exceeding the Governor’s statutory and constitutional authority and violating the separation-of-powers doctrine. And we must take these allegations at face value in undertaking this standing analysis. See City of Louisville v. Stock Yards Bank & Tr. Co., 843 S.W.2d 327, 328 (Ky.1992) (“[I]t is neither the province of the trial court nor of this Court to consider whether Appellant- may be able to-prove its allegations or ultimately prevail. On review, this Court will confine itself to a determination of whether the matters alleged in the complaint establish appellant’s standing to bring the action or whether it is without a ‘substantial interest’ in the subject matter of the controversy.” (citations omitted)).
The Attorney General, therefore, has standing in this ease.
B. The individual legislators do not have standing.
*367 The intervening individual legislators claim to have standing in this case because the Governor’s actions constituted a “grave infringement of their fundamental Constitutional [sic] duty to enact a biennial budget on behalf of their constituents.” As the Governor describes it, they claim, in essence, that he has nullified their votes in favor of the budget bill.
We begin with the legislators’ claim that it has been the practice of this Court to allow members of the General Assembly to “defend the Kentucky Constitution’s ‘forceful command’ that the powers of the Legislative Branch be protected from invasion by the Executive Branch.” This Court’s practice, at least in the cases cited by the legislators, has not been nearly so broad as claimed. The legislators cite, for example, Fletcher v. Commonwealth, 163 S.W.3d 852 (Ky.2005), in which many members of the General Assembly, including at least one of the members in this case, intervened to challenge gubernatorial action. The question of the legislators’ standing, however, was not raised in that case. And, as this Court has held, a claimed lack of standing is a defense that must be timely raised or else be deemed waived. Harrison v. Leach, 323 S.W.3d 702, 708 (Ky.2010). Thus, while Fletcher may be a factual precedent for individual legislators’ having intervened in a- ease, it is not legal precedent for their having standing to challenge the Governor’s actions.
As to the legal substance, of the claim, unlike the Attorney General, • individual legislators do not have the role of chief legal officer for the public. The individualized role of a legislator is to represent those who have elected him or her and to participate in the decision-making that becomes the laws of the Commonwealth, including participating in the passage, of budget bills. The idea that individual legislators have standing to challenge an action by the Governor—-under the premise of an injury to an interest in a statute being carried out properly or the legislators’ duty to vote on legislation—is simply too attenuated to create a justiciable controversy. A legislator has no individual ownership of any enacted piece of legislation and certainly can pass no legislation as an individual. Asserting that a governor’s disposition of budgeted funds is an infringement on their duty to enact a budget is a non sequitur.
Nonetheless, the legislators claim that this Court has seemed in the past to take a “broad[ ] view of when a public official can go to court to defend the prerogatives of office.” (Quoting Paul E. Salamanca, The Constitutionality of an Executive Spending Plan, 92 Ky. L.J. 149, 200 (2004)). In this context, Professor Salamanca discussed Legislative Research Commission v. Brown, 664 S.W.2d 907 (Ky.1984), wherein the Legislative Research Commission sued “to validate its authority under certain parts of the legislation, and the original defendants, the Governor and Attorney General of Kentucky, had by counterclaim called in question other parts.” Salamanca, supra, at 200. But Brown, like Fletcher, is not support for the existence of individual-legislator standing, if only because individual legislators were not the plaintiffs in that case. More importantly, standing again was not raised in that case, at least hot before this Court. See id, (noting that “the issue of representative standing was not addressed in the Legislative Research Commission court’s opinion”),
Obviously, legislators with a particularized, personal injury have standing to seek redress for that injury. Thus, for example, a legislator could sue for the loss of salary. See Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 *368 (1969). But that is not what we have here. Instead, the legislators are claiming some nebulous harm to their duties as legislators.
Individual legislators simply do not have a sufficient personal stake in a dispute over the execution or constitutionality of a statute, even when the claim is that another branch of government is violating the separation of powers. The United States Supreme Court reached the same conclusion when members of Congress sought to challenge the constitutionality of the Line Item Veto Act in the 1990s. See Raines v. Byrd, 521 U.S. 811, 830, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). There the Court held that “individual members of Congress do not have a sufficient ‘personal stake’ in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing.” Id. Although Article III does not dictate the contours of the law of standing before this state’s courts, we generally require the same particularized, personal injury when individuals seek to bring a claim.
The individual legislators have not shown that they are representative of the entire body of the General Assembly. They “have not been authorized to represent their respective Houses ... in this action.” Id. at 829, 117 S.Ct. 2312. They are not numerous enough to demonstrate that they represent a sufficient bloc of votes to act on behalf of the whole legislature, as was the case in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). Indeed, they constitute only three of one hundred members of the House (and no members of the Senate). And, finally, they are not presiding officers of either house, whose “unique status” may give them “an enhanced capacity to maintain suit to prevent non-legislative disbursements from the treasury.” Salamanca, supra, at 201. We need not decide today whether satisfaction of any of these conditions would suffice to give standing, however, as it is clear that the individual legislators in this case have met none of them.
Finally, it must be noted that the legislators did not actually file an original complaint in this case. Instead, they permissively intervened under Civil Rule 24.02. Whether that intervention was proper has not been argued to the Court, and we therefore leave that question for another day.
C. Conclusion
As recounted above, the Attorney General is the state’s chief legal officer and, as such, he has broad powers under statutory and common law to defend the public interest. This includes challenging conduct that he believes violates the Constitution’s strict separation of powers or is otherwise unlawful. For that reason, he has standing to bring his claims challenging the Governor’s actions in this case.
The individual legislators, on the other hand, do not enjoy such a broad power of representing the full Commonwealth. To have standing, they must allege some type of particularized injury. They have not done so here. Thus, the individual legislators in this case do not have standing to challenge the Governor’s actions.
We note, however, that no one has asked that the legislators be dismissed from the claim. Instead, the legislators’ standing has been challenged in the context of a two-pronged attack that depends on the Attorney General also not having standing. If both lack standing, then the entire case should be dismissed. But the Governor’s standing claim is framed as an alternative ground for affirming the Franklin Circuit Court’s decision, and he acknowledges that it would require this court to conclude “that none of the parties have standing.” *369 (Emphasis added.) Even so, as to justicia-bility of this action, clearly only one plaintiff need have standing for the case to proceed. Since the Attorney General does have standing, this case remains a justicia-ble action properly before this Court. And since the Governor has asked only that the case—and not the individual parties—be dismissed, and because this is the Court of last resort -in this matter, the propriety of the legislators participating in this case is moot.
III. Does the Governor have authority to reduce the Universities’ fourth-quarter allotments or otherwise require them not to spend funds?
Having addressed standing, we begin our discussion of the merits with a brief overview of the budgeting process. That process consists largely of two steps: (1) the appropriation of funds and (2) the expenditure of funds.
The first step consists primarily of the legislative appropriation process, as required by the Constitution. By default, the state treasury may not be accessed without legislative action, in the form of an appropriation. See Ky. Const. § 230 (“No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law .... ”). As the Governor points out, an appropriation sets a ceiling on an expenditure, as it is for “a sum of money not in excess of the sum specified.” KRS § 48.010. Although this is correct, it is only half the story. An appropriation is also “an authorization by the General Assembly to expend a sum of money.” Id.
The second stage of the budgeting process is the spending of money as authorized in the appropriation. Appropriated funds are not usually expended all at once. Instead, they are divided into quarterly allotments, to be used over the course of the fiscal year. KRS § 48.610. The expenditure of funds itself ordinarily occurs though the issuance of warrants to the Treasurer, who then writes a check or transfers the money to whomever it is owed. KRS § 45.456. But the Universities differ from most of state government in that their appropriations are made directly available to them. KRS § 164A.555.
There is no question that the. Governor has the- authority to make budget reductions in limited circumstances. Specifically, where there is a budget shortfall of 5% or less, the General Assembly has authorized the Governor (and the heads of the other branches of government) to reduce appropriations under a legislatively prescribed budget-reduction plan. KRS § 48.130.
But that statute does not authorize the Governor’s action in this case. There was no budget shortfall in the final quarter of the' 2015-2016 fiscal year. In fact, there was a surplus. Nonetheless, the Governor sought to reduce the fourth-quarter allotments so that the funds could possibly be used for other future spending. Specifically, he hoped to buttress Kentucky’s state pension systems.
The primary question in this case is whether the Governor has authority to reduce the Universities’ fourth-quarter allotments in this manner and under these circumstances, or to otherwise require the Universities not to spend the funds. The Governor, as the chief executive of this Commonwealth, has only the authority and powers granted to him by the Constitution and the general law. He is the chief executive of the Commonwealth. Ky. Const. § 69. But the Governor, like everyone, is bound by the law. Indeed, the Governor has a special duty with respect to the law, as he is commanded to “take care that the laws be faithfully executed.” Ky. Const. § 81.
*370 Although questions about the constitutional separation of powers have been raised in this case, the issue is primarily whether the statutes controlling the budgeting process give the Governor the authority that he claims and whether his authority with respect to the expenditure of appropriated funds has been limited by other statutes. The Governor has identified three possible sources for his authority. Two of these are explicitly statutory— KRS §§ 48.620(1) and 45.253(4). The third is his general authority over executive branch budget units and the power to require those units not to spend appropriated funds. We address each in turn.
We also note that the Attorney General claims the Governor’s actions and these statutes violate the Constitution’s requirement of strict separation of powers among the branches of government. See Ky. Const. §§ 27-28. This Court, like most, follows “the principle that constitutional adjudication should be avoided unless it is strictly necessary for a' decision in the case.” Trigg v. Commonwealth, 460 S.W.3d 322, 330 (Ky.2015). For that reason, the first consideration is whether the Governor has exceeded his authority under the statutes rather than whether his actions or the statutes violate the Constitution. Only if the statutes give the Governor the authority he claims, or do not otherwise limit his authority, would we need to address the constitutional question. Given our resolution of the statutory questions in this case, we need not specifically address the constitutional question.
A, The statutory claims
Before turning to the statutes themselves, it is helpful to examine the role of judges when confronted with a statute. We did not enact the law. That is the role of the legislature. We do not execute the law. That is the role of the executive. Rather, we interpret and apply the law. As Chief Justice John Marshall stated: “Courts are the mere instruments of the law, and can will nothing. ... Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law,” Osborn v. Bank of U.S., 22 U.S. 738, 866, 9 Wheat. 738, 6 L.Ed. 204 (1824). Our task, then, is to read the statutes and discern their meaning, and nothing more.
This is not always an easy task. Statutory interpretation can, at times, be complex, just as statutes can be complex. We begin, perhaps obviously, with the language of the statutes, but we often cannot end there. “Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea ..., ” M’Culloch v. Maryland, 17 U.S. 316, 414, 4 Wheat. 316, 4 L.Ed. 579 (1819). We thus resort to an arsenal of interpretive tools, referred to variously as canons of construction or rules of interpretation, in an effort to arrive at a fair reading of the controlling statutory language.
1. Revising allotments under KRS § 48.620.
The first question is whether reducing an allotment, without increasing other allotments by an equal amount, is a permissible revision of the allotment under KRS § 48.620(1). This Court concludes that the statute does not give the Governor the authority to revise allotments in this way.
We reach this conclusion after examining the statute in context, both that .within KRS § 48.620(1) itself and that in other provisions of KRS Chapter 48. When the statute speaks of revising allotments, it refers to the schedule of allotments, that is, the timing of the payments throughout the fiscal year. Not only does KRS *371 § 48.620(1) refer expressly to revising the schedule, other provisions of KRS Chapter 48 and the budget bill itself require that the allotment conform to the General Assembly’s appropriations. The only way for this to happen is if the full amount appropriated is included in allotments over the year. Moreover, this reading is compelled by an examination of the statutory—as opposed to legislative—historjy of KRS Chapter 48, which shows that allotment revision has always been abojut revising the schedule of allotments.
a. The language of the statute in context requires revision of allotments to refer to scheduling, not just the amount, of the allotments.
Again, we begin with the language of the statute:
Allotments shall be made as provided by the allotment schedule, and may be revised upon the written certification of the Governor, the Chief Justice, and the Legislative Research Commission for their respective branches of government. No revisions of the allotment schedule may provide for an allotment or allotments in excess of the amount appropriated to that budget unit in a branch budget bill, or for expenditure for any other purpose than specified in a branch budget bill.
KRS § 48.620(1). Although the statute does not group the words together as a single term, it is clear that we are concerned generally with the meaning of an allotment revision.[6]
“Allotment” is not a statutorily defined term. Its meaning, however, is fairly clear: a “share or portion of a thing that is given to someone or something.” Black’s Law Dictionary (10th ed. 2014). It is “[s]ome-thing allotted,” and “allot,” in turn, means “[t]o parcel out; distribute or apportion” or “[t]o assign as a portion; allocate.” American Heritage Dictionary of the English Language (5th ed. 2011). In this context, it means a portion of a given appropriation.
Allotments are made on a quarterly basis, rather than the full amount of each appropriation being made available at the beginning of the fiscal year. This reflécts the dual reality that expenses do not arise all at once, and that the state is rarely flush with sufficient cash to pay all those expenses at once and must instead rely on the revenue stream from taxes. In short, the quarterly allotment system’is a means of coordinating revenués with expenditures.
“Revise” means “[t]o alter or edit (a text).” Id. An “act .. of revising” is a “revision.” Id.
The Governor reduced the fourth-quarter allotment for the Universities by 2%. In a sense, this is a “revision”—in that it is literally an alteration of the allotment amount. The Governor claims that his action was allowed by the statute, as its only express limits are on revisions that would “provide for an allotment or allotments in excess of the amount appropriated to that budget unit in a branch budget bill, or for expenditure for any other purpose than specified in a branch budget bill.” KRS § 48.620(1); This, he claims, allows for revisions of allotments down—a reduction without a corresponding increase of other allotments—under the doctrine of expres-sio unius (otherwise known as the negative-implication canon). In other words, because the statute expressly includes a limit on revision, other limits are not included. *372 The Attorney General instead claims that the statute is about the timing of payments, not- in the literal sense of whether the payment should be on the first or the fifteenth of a month, but in the sense of in which quarter any given penny is allotted. In other words, according to the Attorney General, the power to revise an allotment is simply the power to move a penny from one quarter to another, either by advancing money to one allotment or putting it off to another. The Governor responds that the plain language of KRS § 48.620(1) says nothing about the revision going to the schedule of allotments because “allotments,” in the first sentence, are what “may be revised.” And the allotment is the amount of money available in any given quarter.
But allotment revision is not the only description of revision in the statute. The second sentence of KRS § 48.620(1) refers to “revisions of the allotment schedule.” That sentence cannot be ignored because statutes “must be read as a whole and in context with other parts of the law.” Lewis v. Jackson Energy Co-op. Corp., 189 S.W.3d 87, 92 (Ky.2005).
This .is the “whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.” Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012). The canon recognizes that discrete statutory language falls within a larger context, and that “[c]ontext is a primary determinant of meaning.” Id.
And the second sentence of KRS § 48.620(1) greatly affects the statute’s meaning. It literally says that the revision allowed by KRS § 48.620 will be to the allotment schedule. Given this context, allotment revision in the first sentence cannot be read to mean that any change constitutes a permissible revision under the statute. Just as the Governor would have us consider the second sentence’s prohibition on allotments exceeding appropriations, so too must we consider its use of “revisions of the allotment schedule.”
With this context in mind, we conclude that revision of an “allotment” in KRS § 48.620(1) refers to revising the schedule of allotments. Obviously, the statute allows a reduction of an allotment. It also allows an increase in an allotment. But when an allotment is revised up or down, there must be a corresponding revision of át least one other allotment. If the fourth-quarter allotment is reduced by 2%, then other allotments must be increased to balance the reduction, so that the sum of the quarterly allotments reflects the appropriated amount. If the revision is attempted too late, so that the other allotments cannot be revised, then revision is not allowed.[7]
This allows the allotments to comply with the requirements of KRS § 48.610, which commands: “Allotments shall conform with the appropriations in the enacted branch budget bills or other appropriation provisions.” This reading also allows compliance with the 2014 Executive Branch Budget Bill itself, which commands that “Allotments within appropri *373 ated sums for the activities and purposes contained in the enacted Executive Budget shall conform to KRS § 48.610.” 2014 Ky. Acts Ch. 117, Part III, § 4.[8] KRS § 48.610, of course, requires that allotments conform to appropriations, but it also creates the “schedule of quarterly allotments of appropriations for each budget unit of the branch.” KRS § 48.610. Allotments can only conform to KRS § 48.610 if they conform to the quarterly allotment schedule.
Only by having the full schedule of allotments comport with the appropriation can this be accomplished. Under the Governor’s proposed reading of KRS § 48.620(1), it cannot. Not only is KRS § 48.610 an additional element of context in which KRS § 48.620(1) is to be considered, it is a direct command that allotments are to conform to the appropriations made by the General Assembly. That command cannot be ignored.
This reasoning carries with it the weight of logic and considers the effect of other statutory references to “allotments.” It thus offers a sounder basis for interpreting the statute than relying on expressio unis as applied to the appropriation-maximum qualification in KRS § 48.620(1). Although that is unquestionably a legitimate principle of statutory interpretation, it should be used cautiously and simply cannot control here as explained in footnote 8. The other approach discussed provides a better indication of meaning here.
b. The meaning of allotment revision throughout the statute’s history also requires it to be read as referring to the scheduling of allotments, and not just amounts.
The whole-text canon—as applied to the immediate context of the statute—is not the only one showing that KRS § 48.620(1) allows only revision of the schedule of allotments. An examination of the statute’s history[9] also demonstrates that it has always been concerned with revising the allotment schedule, rather than reducing a single allotment.
Thus we apply the fixed-meaning canon. This canon would have words “be given the meaning they had when the . text was adopted.” Scalia & Garner, supra, at 78. KRS § 48.620 was adopted in 1982, and the language at issue in subsection (1) has *374 not changed since that time. Thus, it bears the same meaning that it had at that time.
But KRS § 48.620 does not exist in a vacuum, nor did it in 1982. Indeed, the statutory scheme at issue here has a long history and includes more than the provision allowing revision of allotments. Some understanding of the larger existing scheme, and how it came to be (in terms of amendments), sheds light on what allotment revision in KRS § 48.620 meant in 1982 and now. We thus also apply the principle that “[sjtatutes in pari materia are to be interpreted together as though they were one law.” Scalia & Garner, supra, at 252.
KRS § 48.400 to .810 address general monitoring and revision of the budget during the course of the biennium. Included in this scheme is KRS § 48.620 allowing the Governor to revise allotments. It also includes KRS § 48.605, which allows revisions of allotments at the request of the head of a budget unit.
Also included in this scheme is express authorization for the Governor to induce an appropriation under certain circumstances. See KRS § 48.600. Generally speaking, this statute very narrowly and specifically grants the Governor the authority to reduce appropriations when there is an estimated or actual • revenue shortfall in the general fund of 5% or less. KRS § 48.600(1).
Even then, the Governor is not given free rein. Instead, he may reduce appropriations only “in accordance with the budget reduction plan included in the enacted branch budget bill,” id. and no. .reductions under the plan are permitted “in excess of the actual or projected revenue shortfall,” KRS 48.600(2). And if the shortfall exceeds or is expected to exceed 5%, then action can only be taken by the General Assembly. See KRS § 48.130(3) (“Any revenue shortfall in the general fund or road fund of greater than five percent (5%) shall require action by the General Assembly.”).
On its face, the Governor’s claim to broad authority under KRS § 48.620(1) to change the amount of money available to the Universities when there is a budget surplus is inconsistent with his needing legislative authorization to do the same thing when there is an actual or anticipated budget shortfall under KRS § 48.600. And when the statutes’ history is reviewed, it is evident that they are, in fact, very different powers, and that only one has been given to the Governor.
From 1982 to 2009, when faced with budget shortfalls, the Governor could not reduce appropriations.[10] Rather, he could reduce allotments under those circumstances. See KRS § 48.600(1) (1982) (commanding the Governor to “make any allotment reductions for the budget units” that were necessary). He was also required to “take any steps to revise allotments for [his] respective branch[ ] that [wejre necessary to prevent a cash deficit.” Id.
KRS § 48.620, the allotment-revision statute, also existed at that time. Its first two sections read much -as they do-now:
(1) Allotments shall be made as provided by the allotment schedule, and may be revised upon the written certification of the Governor, the Chief Justice, and the Legislative Research Commission for their respective branches of government. No revisions of the allotment schedule may provide for an allotment or allotments in excess of the amount appropriated to that budget unit in a branch budget bill, or for expendi *375 ture for any other purpose than specified in a branch budget bill and a budget memorandum provided for by KRS § 48.300.
(2) Revisions of allotments under this section shall be reported and reviewed as provided by subsection (4) of KRS § 48.500.
KRS 48.620 (1990).[11]
But the pre-2009 version included two additional provisions:
(3) When the actual tax receipts accruing to the general fund or road fund, as appropriate, do not permit all the allotments provided for by the schedules of allotments of all branches of government, the secretary of the Finance and Administration Cabinet shall notify all branches of government and each branch shall take - appropriate action concerning allotments.
(4) This subsection shall not apply in the event of a projected or an actual . deficit in tax receipts of the general or road funds as determined by. KRS § 48.130.
KRS § 48.620 (1982).[12]
These provisions are important indicators of the meaning that allotment revision had when the first subsection' was originally-enacted. Subsection (3) required the Finance and Administration Cabinet'to give notice when actual tax receipts would not permit all of the allotments, and the affected branches of government,were to take appropriate action, presumably, by revising allocations as allowed under subsection (1).
On its surface, insufficient actual tax receipts sounds like a budget deficit, but subsection (4) stated that KRS § 48.620 was not to apply in the event of a projected or actual deficit. Instead, upon such an occurrence, assuming the deficit was less than or equal to 5%, KRS § 48.600 went into effect. Again, under the version of that statute then in effect, the Governor was allowed- to make both allocation reductions and allocation revisions. But the two were unquestionably different acts, as the former was only allowed in the event of a deficit, .
So when was the revision process laid out in KRS § 48,620 to be implemented? “When the actual tax receipts accruing to the general fund or road fund, as appropriate, d[id] not permit all the allotments,” KRS § 48.620 (1982), but not when there was a projected or actual deficit. What is the difference between the two scenarios? An actual deficit is .when the state has literally run out of money for the year, but still has unpaid expenses. A projected deficit is when the state is projected to run out of money before the end of the year while still having projected expenses.
But tax receipts can be insufficient temporarily to' pay out an allotted amount without there being an expected deficit overall for the year. Just as “the Commonwealth does not receive all its anticipated receipts on the first day of the fiscal year,” Aff. of Kathleen Marshall[13] at 4, it is possible that anticipated receipts may not *376 be received on the day they are actually expected or simply do not coincide with the timing of an allotment. That is when KRS § 48.620 was set to go into effect. If, for example, actual tax receipts in the first quarter were insufficient to pay a full allotment, but the funds were expected to be available in the second quarter, then the allotments could be revised to reflect the reality of, and expectations about, the state’s revenue stream. This indicates that revision of allotments, as allowed under subsection (1), was about changing the schedule of payments.
Moreover, the version of KRS § 48.600 then in effect demonstrates that a reduction of an allotment, which was allowed when there was a deficit, was different from a revision of an allotment. Revision of an allotment was also allowed when there was a deficit, but short of a deficit, only a revision was allowed, not a reduction.
Under the fixed-meaning canon, the meaning of allotment revision, thus, must still refer to changing the schedule of the allotments. If one allotment goes down, another must go up, resulting in the same overall appropriated amount being allotted over the course of the fiscal year. Revision, in this context, differs from reduction, which means a departure down from the appropriated amount. Reduction was allowed in 1982 only when there was a deficit; the same holds true now.
The obvious response to this analysis is that subsections (3) and (4) are no longer the law, having been repealed in 2009. That, however, does not mean that subsection (l)’s meaning was changed. Unquestionably, “a significant change in language is presumed to entail a change in meaning.” Scalia & Garner, supra, at 256. But the language in subsection (1) was not changed, even though the overall statute was amended. Indeed, that subsection (l)’s language was left intact suggests that its meaning remained fixed intentionally.
And, as explained above, as used before 2009, revision of an allotment necessarily meant something different from reducing an allotment. Thus, even if allotment revision were ambiguous under the current statutes, “it is fair to argue that giving an ambiguous term one meaning rather than another would cause it to make no sense as used in an earlier-enacted statute ... so that such an interpretation should be rejected.” Id. at 323. The Governor’s proposed reading of the statute would not have made sense under the pre-2009 version of the statute, even though the language in question has not been changed. For that reason, that interpretation must be rejected.
Still other changes made in 2009 suggest that revision of an allotment continues to mean a change in the timing of payments, rather than a reduction. KRS § 48.600 was amended at that time so that reductions in the event of a deficit (now “revenue shortfall”) were to be made to appropriations, rather than allotments. And instead of allowing these reductions to be made as “deemed necessary” by the head of the branch of government, they are now to be made “in accordance with the budget reduction plan included in the enacted branch budget bill.” At the same time, subsections (3) and (4) of KRS § 48.620 were repealed. These provisions were no longer necessary to clearly establish the difference in when KRS § 48.600 and .620 were to be used because the reduction-revision distinction was clarified. But that was because the distinction between a revision of an allotment and what had been called a reduction of an allotment (now a reduction of an appropriation) had been clarified.
*377 In light of this statutory history, it is evident'that KRS§ 48.620(1) has always been addressed to revising the schedule of allotments. Nothing in the amendments in 2009 suggests that this language means something different now.
2. Withholding allotments when there are trust and agency funds under KRS § 45.253(4).
As an alternative, the Governor claims that his action, in substance, was permitted by KRS § 45.253(4), which allows the Secretary of the Finance and Administration Cabinet to “withhold allotment of general fund appropriations to the extent trust and agency funds are available.” As noted above, the Governor presented evidence that the Universities had available adequate trust and agency funds to cover the reductions he made, and thus there would be nothing unlawful about the Secretary withholding allotment of 2% of the fourth quarter’s general-fund appropriations.
The problem with the Governor’s position, however, is that the financial administration of state universities is governed by KRS § 164A.555 to .630.[14] And KRS § 164A.630(2) states specifically that “[a]ny other provisions of KRS Chapter[ ] ... 45 ... to the contrary notwithstanding, KRS § 164A.555 to § 164A.630 shah govern the financial management of higher education.”[15] Thus, to the extent that KRS Chapter 45, including 45.253(4), is inconsistent with KRS § 164A.555 to .630, the latter set of provisions controls.
The Governor argues that there is no inconsistency and, that to the extent there could be one, any conflict should be resolved in favor of reading these statutes in harmony if possible. It is unquestionable “that where two statutes are in apparent conflict, their inconsistencies should be reconciled if possible.” Commonwealth v. Martin, 777 S.W.2d 236, 238 (Ky.App.1989); see also Scalia & Garner, supra, at 180 (“The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.”). The question is whether the statutes can be read in harmony.
The Governor notes that the financial-management provisions of Chapter 164A are about the internal financial management of the Universities, whereas KRS § 45.253(4) applies to the Finance and Administration Cabinet. Because they govern different entities, goes the argument, they cannot be in conflict. This is largely correct, as most provisions of KRS § 164A.555 to .630 are directed to the internal financial management of the Universities.
But not every provision is. Indeed, the very first provision, KRS § 164A.555, is instead directed at the Finance and Administration Cabinet. It states:
The secretary of the Finance and Administration Cabinet shall issue warrants authorizing the Treasurer of ..the Commonwealth of Kentucky to pay. to the treasurer of each institution any amounts due by virtue of the state appropriations for that institution, or transfer the amount due electronically if electronic transfer is authorized by statute. The transfer of funds shall be handled in a manner to assure a zero (0) balance in the general fund account at the university.
*378 KRS § 164A.555. This statute specifically directs the secretary to bypass the ordinary process of issuing warrants to the Treasurer to. pay expenses on behalf of a government body and to instead issue warrants to the Treasurer to pay. “any amounts due” directly to the Universities.
The Governor argues that this statute accomplishes only one thing: it allows the Universities to pay their own bills, rather than relying on the Finance and Administration Cabinet and the Treasurer as each bill comes due. It certainly has that effect, but that is not all the statute does. It is a direct command to the Secretary of Finance and Administration Cabinet to pay “any amounts due by virtue of the state appropriations for that institution.” KRS § 164A.555. The “amounts due by virtue of the state appropriations” is exactly that: the amount appropriated— the full amount.
Again, the Governor disputes that this requires the full amount, and argues that “any amounts due” simply “refers to any amount up to the appropriated amount.” He notes again his argument that an appropriation is only a ceiling and that not every penny must be spent. Again, this is true but is not the full story. An appropriation is also an authorization for the expenditure of funds.
More importantly, KRS § 164A.555 is simply not ambiguous. To the extent an amount is authorized by an appropriation, KRS § 164A.555 recognizes that amount is “due” to the Universities. Although the word “due” has many uses and meanings, its relevant meaning here—in the context of an amount of money—is “[playable immediately or on demand” or “[ojwed as a debt; owing.” American Heritage Dictionary of the English Language (5th ed. 2011). Indeed, the usage example’ offered for this latter definition is “the amount still due.” Id. Although the first use is more common in modern English, see Bryan A. Garner, Gamer’s Dictionary of Legal Usage 300 (3d ed. 2011), both meanings demonstrate that whatever amounts are “due” under the appropriations are amounts to which the Universities are entitled, whether immediately or as a debt. Either way, the statute orders the Secretary of Finance and Administration to issue warrants for those amounts. (“Due” is limited here to some extent by the statutes requiring quarterly allotments; in' other words, the full amount does not become due at the beginning of the fiscal year.)
And the word “any” further confirms this understanding that the full amount must be paid. Although it has multiple senses, the word as used here means “every” or “all.” See American Heritage Dictionary of the English Language (5th ed. 2011) (“Every: Any dog likes meat.”); Bryan A. Garner, Garner’s Modem English Usage 57 (4th ed. 2016) (noting that “any” has six uses as an adjective but that “[i]n affirmative sentences, it means ‘every or ‘all’ ,.. <you are required to produce any documents relating to the issue>”). Thus, the statute cannot mean that an amount less than the full appropriation can be paid to the Universities. Instead, a warrant for all of the amount or every amount due must be issued by the Secretary. Any action less would not comport with the directive of KRS § 164A.555.[16]
And that the full amount is due is further confirmed by the budget bill itself. *379 Specifically, 'the 2014 Executive Branch Budget Bill commanded “that the Executive Branch shall carry out all appropriations and budgetary language provisions as contained in the State/Executive Budget.” 2014 Ky. Acts Ch. 117, Part III, § 27. The only way to do so was to comply with KRS § 164A.555. • , , .
In short, the conflict between KRS §§ 164A.555 and 45.258(4) is inescapable. The two cannot be read together without ignoring the plain meaning of the language in KRS § 164A.555. Because KRS § 164A.630(2) commands that the provisions of KRS Chapter 164A control over KRS Chapter 45 if there is a conflict, KRS § 164A.555 must control. Thus, the Finance and Administration Cabinet cannot withhold the .Universities’ allotments even if they have sufficient trust and agency funds to cover their expenses.
Any concerns the Governor raises about an appropriation not requiring the expenditure of the full amount—of every penny—are alleviated by the fact that any funds paid to the Universities on the Secretary’s warrant but not spent will lapse back to the general fund. See KRS § 164A.565(2) (“Any uncommitted state general funds remaining after the close of business on the last day of the fiscal year shall lapse and be returned to the Treasury of the Commonwealth.”).[17] Thus, it is evident that the Universities, like any other state agency with discretion in how it spends money, are not required to expend every penny appropriated to them. Nor is that money lost to the state, as it is returned if not spent.
B. The Governor’s authority to decline to spend appropriated funds is statutorily limited with respect to the Universities.
■ The Governor has not explicitly claimed the inherent authority to require the Universities not to spend their funds. But this understanding of executive power is implicit in his argument. Indeed, he emphasizes in his brief that, while the, power of the purse belongs to the legislature, “administering an appropriation and spending money is an executive function.” And he claims that, he has acted within that realm, having “taken the purse, pf money provided by the legislature and Maying] reasonably decided that the legislature’s will can.be satisfied , without spending all of the money in the purse.” We recognize that the Governor has disclaimed- the existence of “unfettered power to withhold appropriated money and reduce spending,” and instead claimed authority for his actions under the statutes, addressed above. At the same time, however, he claims, under the guise of laying, out a limiting principle on his authority, that he “may direct budget units to spend less than the full amount of an appropriation so long as ‘he has determined that such a decision will not compromise the achievement of underlying legislative purposes and goals.’ ”, (Quoting Opinion of the Justices to the Senate, 375 Mass. 827, 376 N.E.2d 1217, 1223 (1978)). The acknowledgement of this limiting principle, however, contains in it a suggestion of an authority that does not exist with respect to the Universities.
The existence and breadth of such an authority generally is not before us. Thus we do not address whether the Governor’s exercise of such authority in other areas of the' executive budget might create a constitutional challenge as the Attorney General has claimed. Here, the statutory language is clear that the legislature has not given *380 the Governor control over the Universities’ áppropriated funds regardless of whether such authority exists in regard to other budget units.
In suggesting that reducing the Universities’ allotments has been essentially a decision not to spend the money, the Governor relies heavily on the notion that an appropriation is a ceiling on spending. There is little question that an appropriation does not mandate the expenditure of all the funds authorized (unless the appropriation says otherwise). Indeed, the budget bill at issue in this case itself notes that “[t]here is appropriated ... the following discrete sums, or so much thereof as may be' necessary.” 2014 Ky. Acts Ch. 117, Part I, § (1).
So the question is simple: May the Governor order the Universities not to spend their funds? Or, as the trial court suggested, are “[t]he Universities ... under the Governor’s control as part of the executive branch”? Although the Universities are state agencies and are attached to the executive branch for budgetary purposes, they are not part of the executive branch in the same sense as the program cabinets and boards directly under the Governor’s control.
Unlike those cabinets and boards, the Universities’ boards are separate “bod[ies] corporate, with the usual corporate powers.”[18] KRS § 164.350; see also KRS § 164.460 (same for the University of Kentucky); KRS § 164.830(1) (same for the University of Louisville). They are expressly excluded from being part of the Department of Education. KRS § 164.285.[19] In some ways, they are akin to municipal or public corporations, having a separate existence from the main body of government, although retaining many of the government’s characteristics, such as immunity from suit.
The Universities’ boards have close to plenary power over the operation of their respective institutions. For example, they have exclusive control over appointments, qualifications, and salaries of faculty and employees. KRS § 164.365(1); KRS § 164.220 (UK); KRS § 164.830 (U of L).
And the Universities are all generally-given authority to receive and spend money from all sources. The Universities other than the University of Kentucky and the University of Louisville are given the power to receive and spend money under KRS § 164.350(1): “Each board may: (a) Receive grants of money and expend the same for the use and benefit of the university or college ....” If they opt to proceed under KRS § 165.555 to .630, which the Universities have done, they may “receive, deposit, collect, retain, invest, disburse, and account for all funds received or due from any source including, but not limited to, state and federal appropriations.” KRS § 164A.560(2)(a). This grant of authority is even more explicit with respect to the boards of the University of Kentucky and University of Louisville, both of which are expressly given the authority to receive *381 and spend appropriations and allotments. See KRS § 164.160 (giving UK board power to “receive, hold and administer ... all revenues from ... appropriations, [and] allotments”); KRS § 164.830(l)(d) (stating powers of U of L board include “receipt, retention, and administration ... [of] all revenues accruing from ... appropriations, [and] allotments”),
There are, of course, some limits on how the boards operate. For example, certain expenditures must be approved by the Finance and Administration' Cabinet or the Council on Postsecondary Education. See KRS § 164A.575 (requiring cabinet approval for real property purchases); KRS § 164.020(1l)(a) (giving council power to approve certain capital construction projects). But that does not otherwise bring the financial decision-making—the choice whether to spend funds—back within the purview of the Governor.
The Governor also has some say with respect to the Universities’ boards. For example, he gets to appoint most of the members of the boards. See KRS § 164.131(l)(e) (UK); KRS § 164.821(1) (U of L); KRS § 164.321(l)(a) (other universities). And he may remove members for cause. See KRS § 63.080(2); KRS § 164.131(l)(d) (UK); KRS § 164.821(l)(b) (U of L); KRS § 164.321(10) (other universities); KRS § 164.325 (specifically applying 63.080(2) to boards of regents).
These provisions, however, do not undermine the university boards’ fundamental independence. A large portion of this independence is financial self-control. The authority over the expenditure of funds appropriated to the Universities has been statutorily lodged with independent boards that head these institutions. Those boards may decline to spend funds appropriated to them, in which case the funds will lapse.[20] But by giving that authority to the boards, the General Assembly has necessarily deprived the Governor of it. We thus conclude that the Governor cannot order the boards of the Universities not to spend funds appropriated to them.
The Governor’s authority with respect to the boards differs fundamentally from his authority with respect to those state entities and employeés that answer to him, such as the program cabinets and secretaries who head those cabinets. In this sense, the. Universities are much more like private entities. And their authority over spending their money is largely independent of the executive branch. ■
Indeed, this is likely why the Universities, unlike other government entities,' aré given their own money to be held in their own accounts, rather than relying on the Finance and Administration Cabinet’s submitting warrants to the Treasurer,, who would then write checks to third parties owed money by the Universities:
The secretary of the Finance and Administration Cabinet shall issue warrants authorizing the Treasurer of the Commonwealth of Kentucky to pay to the treasurer of each institution any amounts due by virtue of the state appropriations for that institution, or transfer the amount due electronically if electronic transfer is authorized by statute. The transfer of funds shall be handled in a manner to assure a zero (0) balance in the general fund account at the university.
KRS § 164A.555.
This illustrates why the Governor’s suggestion that he has simply stopped the *382 money from being spent mischaraeterizes what he has actually done. Rather than ordering the Universities not to spend money, which he cannot do, and thereby allowing those funds to lapse back to the General Fund at the end of the fiscal year, he has instead effectively intercepted the funds before they became available to the Universities. By reducing the final quarterly allotment, the Governor has essentially frustrated the overall appropriation by the General Assembly. Money that the General Assembly made available to the Universities through its appropriations was made unavailable by the Governor’s actions. Simply put, there is a difference between exercising an authority not to spend money once it has been made available and preventing the money from being made. available to the entity that has the power to decide not to spend it.
Again, this is not to say that every penny appropriated must be spent. As the Governor points out, such a legal requirement would be fiscally irresponsible. And the budget bill itself recognizes this by authorizing the spending of appropriations “or so much thereof as may be necessary.” But the Governor does not have the power to make that decision for the Universities.
And if the Governor does not have discretion over whether to spend the money because the funds were appropriated for an entity over which he does not have control, then the transfer of funds “is a ministerial, mechanical, non-discretionary act.” People ex rel. Bakalis v. Weinberger, 368 F.Supp. 721, 726 (N.D.Ill.1973). Indeed, KRS § 164A.555, discussed above, further demonstrates how this is a ministerial act: it commands the secretary of the Finance and Administration Cabinet to issue warrants for the payment of the Universities’ “any amounts due by virtue of the state appropriations for that institution,” That statute also necessarily limits the Governor’s authority, as he cannot legally compel the secretary to act contrary to law. And, again, the budget bill itself commanded “that the Executive Branch shall carry out all appropriations and budgetary language provisions as contained in the State/Executive Budget.” 2014 Ky. Acts Ch. 117, Part III, § 27. This limit makes the Governor’s conduct with respect to entities over which he has no control purely ministerial.
Consequently, we need not address the constitutionality of the actions the Governor claims he is entitled to make, because our statutory analysis makes it clear that he does not have the legal authority to take such actions.
IV. Conclusion
The Governor’s reduction of the allotments of the Universities in this case exceeded his statutory authority to revise allotments under KRS § 48.620(1) and his authority to withhold allotments under KRS § 45.253(4). Whatever authority he might otherwise have to require a budget unit riot to spend appropriated funds does not extend to the Universities, which the legislature has made independent bodies politic with control over their own expehdi-tures. We therefore do not reach the question of whether his actions were constitutional, as the statutes do not give him the authority to act as he proposed. For these reasons, the Franklin Circuit Court’s order upholding the Governor’s actions is reversed, and this matter is remanded for further proceedings consistent with this opinion.
All sitting. Minton, C.J.; Cunningham, Hughes, and Keller, JJ., concur. Venters, J., dissents by separate opinion. Wright, J., dissents by separate opinion in which Venters, J., joins.

. Specifically, it stated: "The allotments ... should be further revised so as to restore 2.5% of the 4.5% downward revisions.” If read literally, this latter action would háve had the effect of restoring only .1125% of the Universities’ budgets (that is, 2.5% of the 4.5% reduction). But it is understood by all involved that this provision changed the overall budget reduction from 4.5% to 2%.

. The Governor’s counsel represents the Governor, along with the State. Budget Director and the Secretary of the Finance and Administration Cabinet. The Treasurer is represented by her own counsel. Their positions, however, appear to align in all respects, and reference to "the Governor” includes all of the Appellees.

. This publication is available at https ://www. ncjrs.gov/pdffilesl/Digitization/16297NCJRS. pdf.

. Not only does the Attorney General have such power, iio judgment declaring a statute constitutionally infirm may be entered without his having been given notice and an opportunity to be heard on the question. KRS § 418.075.

. For a discussion of the Attorney General’s role as intra-branch check and balance on the Governor, see generally William P. Marshall, Break Up the Presidency? Governors, State Attorneys General, and Lessons from the Divided Executive, 115 Yale L.J. 2446, 2464-68 (2006). See also id. at 2449-55 (discussing, generally, common-law origins of the Office of the Attorney General and the development in most states of a "divided executive”).

. We note that KRS § 48.620(1) starts with the word "allotments,” which, as the Governor points out, is modified by a clause beginning with the words "may be revised.” Thus, there is little question that the statute is addressed to “allotment revision,” and that the Governor claims to have made such a revision.

. This understanding of the operation of allotments within appropriations is also consistent with prior decisions governing the legislative appropriation authority. See generally James v. State University; 131 Ky. 156, 114 S.W. 767 (1908) (suggesting that the executive (there the auditor) cannot alter how (and to whom) appropriations are paid out so as to make it impractical, through exhaustion of the treasury funds, to pay some of them at the end of the budget term); Rhea v. Newman, 153 Ky. 604, 156 S.W. 154 (1913) (requiring Treasurer to pay out all appropriated sums despite protestations that would result in a deficit).

. Interestingly, that same provision also commands that ‘‘[a]llotments within appropriated sums for the activities and purposes contained in the enacted Executive Budget ... may be revised pursuant to KRS § 48.605 and this Act.” 2014 Ky. Acts Ch. 117, Part III, § 4. A broad application of the expressio unius canon would suggest that KRS § 48.620, which is not mentioned as a means by which an allotment may be revised, is not applicable to revising allotments under this bill. But that canon "must be applied with great caution, since its application depends so much on context." Scalia & Garner, supra, at 107. Indeed, it "properly applies only when the unius (or technically, unum, the thing specified) can reasonably be thought to be an expression of all that shares in the grant or prohibition involved. Common sense often suggests when this is or is not so.” Id. Nothing in the bill suggests that KRS § 48.620 was intended not to apply to the 2014 Executive Branch Budget Bill (unlike the one passed in 2016, at least with respect to the Universities). Common sense, especially in light of how the allotment-revision statute works, as explained in this opinion, suggests that it was in effect and could be used to revise allotments. This same limit on expressio unius, however, shows why the Governor’s reliance on it to read only an upward limit to revisions is untenable.

. Here, we refer to the history of the statutory language over time in light of amendments'. This is "quite separate from legislative history,” Scalia & Gamer, supra, at 256, which concerns committee reports, floor speeches, and other instances of legislative activity that are not reflected in the language of the statute. Statutory history is part of the context of the existing statutory language and is a more reliable indicator of the statute’s meaning.

. Before 1982, these matters were handled under a different set of statutes. Those were repealed in 1982 and replaced by KRS § 48.400 to ,810..

.These provisions essentially read as they did when enacted in 1982. In 1990, they were amended slightly to add "branch budget bill” instead of “joint budget resolution.” And they were later amended to delete the language "and a budget memorandum provided for by KRS § 48.300” from subsection (1), and to change the cross-reference in subsection (2). Otherwise, the language has been stable.

, These provisions were not amended until repealed in 2009.

. Ms. Marshall is an Analyst in the Office of the State Budget Director.

. Technically speaking, these provisions require the Universities to have opted into their governance. KRS § 164A.560. The Universities all appear to have done so.

. That statute includes an exception not applicable to this case: "with the exception of KRS § 45.990 and 45A.990 having to do with penalties which shall be applicable to violations of KRS § 164A.555 to 164A.630."

. The proof in this case included an affidavit from Kathleen Marshall, an analyst in the Office of the State Budget Director, stating that the Universities do not actually draw their full allotment at the beginning of each quarter, though it is ordinarily available to them. Our reading of the statute does not render this practice unlawful. As long as the appropriated funds are made available, the statute is complied with.

. Funds appropriated for capital construction are excluded from this lapse. KRS § 164A.565(6). .

. Indeed, the Governor’s counsel emphasized at oral argument, albeit in discussing the standing question, that the Universities were separate corporations from the rest of state government.

. That statute went so far as to repeal any statute suggesting that the Universities are part of the Department of Education: "KRS §§ 156.010 and 64.640 and any other statute, to the extent that they provide that the University of Kentucky, Eastern Kentucky State University, Western Kentucky State University, Murray State University, and Morehead State University shall be included in the Department of Education and constitute a division thereof, are hereby repealed.” KRS § 164.285.

. Like the rest of state government, the Universities are subject to a lapse provision if they do no spend state funds before the end of the fiscal year. See KRS § 164A.565(2) (providing for lapse of “uncommitted state general funds remaining after the close of business on the last day of the fiscal year”).