RENDERED: AUGUST 21, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0107-I

DANIEL J. CAMERON, IN HIS OFFICIAL                    MOVANT
CAPACITY AS ATTORNEY GENERAL OF
THE COMMONWEALTH OF KENTUCKY

                        ON TRANSFER FROM COURT OF APPEALS
V.                              NO. 2021-CA-0328
                 FRANKLIN CIRCUIT COURT NO. 2021-CI-00089

ANDY BESHEAR, IN HIS OFFICIAL                    RESPONDENTS
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF KENTUCKY; AND
ERIC FRIEDLANDER, IN HIS CAPACITY AS
SECRETARY OF THE CABINET FOR
HEALTH AND FAMILY SERVICES

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING IN PART, REVERSING IN PART AND REMANDING</u>**

On transfer from the Court of Appeals, we are presented with Movant

Attorney General Daniel Cameron's request for relief from a temporary

injunction issued by the Franklin Circuit Court against implementation of

House Bill (H.B.) 1,[1] Senate Bill (S.B.) 1,[2] S.B. 2,[3] and House Joint Resolution

(H.J.R.) 77[4] which the General Assembly enacted during the 2021 regular

session[5] and which amend the Governor's power to respond to emergencies as

---

[1] Act of Feb. 2, 2021, ch. 3, 2021 Ky. Acts 14.

[2] Act of Feb. 2, 2021, ch. 6, 2021 Ky. Acts 17.

[3] Act of Feb. 2, 2021, ch. 7, 2021 Ky. Acts 26.

[4] Res. of Mar. 30, 2021, ch. 168, 2021 Ky. Acts 1059.

[5] We refer to these four pieces of legislation collectively as "2021 legislation."

granted in KRS[6] Chapter 39A. We find that this matter presents a justiciable case or controversy but that the Franklin Circuit Court abused its discretion in issuing the temporary injunction. Accordingly, we remand this case to the trial court with instructions to dissolve the injunction.

## I. Facts and Procedural Background

On March 6, 2020, in response to the COVID-19 pandemic, Respondent Governor Andy Beshear declared a state of emergency "by virtue of the authority vested in [him] by [KRS] Chapter 39A," *i.e.*, the "Statewide Emergency Management Programs" (KRS §§ 39A.010-990).[7] Business owners subsequently challenged the Governor's authority to issue executive orders and emergency regulations in response to the COVID-19 pandemic, and in November 2020, this Court held that the executive orders were valid since the legislature had given the Governor the power to issue them under the Statewide Emergency Management Programs regime in KRS Chapter 39A. *Beshear v. Acree*, 615 S.W.3d 780, 802 (Ky. 2020). Further, at the onset of the pandemic, the legislature had approved the Governor's emergency declaration. Act of Mar. 30, 2020, ch. 73, 2020 Ky. Acts 310 (2020 S.B. 150). However, in *Acree*, we clarified that going forward, the General Assembly could limit the Governor's statutorily-derived emergency powers should it wish to. *Id.* at 812–13 (noting that "[w]hile the authority exercised by the Governor in accordance with KRS Chapter 39A is necessarily broad," many "checks [exist] on that

---

[6] Kentucky Revised Statutes.

[7] *See* Exec. Order 2020-215 (Ky. Mar. 6, 2020).

2

authority," including "legislative amendment or revocation of the emergency powers granted the Governor[]").

During the 2021 regular session, the General Assembly responded to *Acree* by passing H.B. 1, S.B. 1, and S.B. 2 which restrict the Governor's ability to take unilateral action during declared emergencies. The Governor vetoed those bills and the General Assembly overrode his vetoes. The bills became effective on February 2, 2021.

Thereafter, the Governor and Eric Friedlander, in his official capacity as Secretary of the Cabinet for Health and Family Services ("CHFS"),[8] filed this declaratory action in Franklin Circuit Court seeking a declaration that the recently-passed legislation unconstitutionally infringes upon his executive powers under Sections 2, 27, 28, 36, 42, 55, 59, 60, 69, 75, 80 and 81 of the Kentucky Constitution. The Governor sought injunctive relief preventing enforcement of the legislation pending adjudication of its constitutionality, arguing that the legislation undermines state government's ability to respond to the ongoing COVID-19 pandemic and creates a public health crisis that will result in increased disease and death. The Governor sued Speaker of the House David Osborne, Senate President Robert Stivers, the Legislative Research Commission ("LRC"), and Attorney General Daniel Cameron. The

---

[8] Respondents-Plaintiffs are collectively referred to as "the Governor" herein for ease of reference.

legislative defendants (Osborne, Stivers, and LRC) filed motions to dismiss based on legislative immunity, which the Franklin Circuit Court denied.[9]

Following an evidentiary hearing, the Franklin Circuit Court temporarily enjoined implementation of the challenged legislation, finding that the Governor had presented substantial legal questions concerning the validity of the legislation, the Governor and the public would suffer immediate and irreparable harm in the absence of injunctive relief, and the public interest and the balance of the equities required the granting of injunctive relief. The Attorney General filed for CR[10] 65.07[11] relief with the Court of Appeals to vacate the temporary injunction, arguing that the Franklin Circuit Court lacked jurisdiction to issue the temporary injunction since the Complaint does not present a justiciable issue and the Governor lacks standing.

Not long after the trial court granted injunctive relief, the General Assembly passed H.J.R. 77 ratifying and extending many of the Governor's executive orders and regulations for periods of time ranging from 30 to 90 days, but terminating all other COVID-related orders and regulations. The Governor vetoed that resolution, and the General Assembly overrode his veto. Most significantly, the General Assembly explicitly included Executive Order

---

[9] The trial court's denial of the legislative defendants' motion to dismiss is not at issue in this appeal.

[10] Kentucky Rules of Civil Procedure.

[11] A party may move for interlocutory relief pursuant to CR 65.07 when a circuit court "by interlocutory order has granted, denied, modified, or dissolved a temporary injunction[.]" CR 65.07(1). An appellate court may grant emergency relief if the movant demonstrates that the irreparable injury will occur before the motion for interlocutory relief may be considered by a three-judge panel. CR 65.07(6).

2020-215, the Governor's original emergency declaration, as one of the executive actions which would expire in ninety days, or by June 28, 2021. The Governor then sought modification of the temporary injunction to cover HJR 77, to which the Attorney General objected. The Franklin Circuit Court granted the Governor's request and put a hold on the implementation of HJR 77 as well. The Attorney General immediately filed for CR 65.07 relief with the Court of Appeals to vacate the modified injunction. The Court of Appeals recommended transfer of the case to this Court, which we accepted on an expedited basis due to these issues being of great and immediate statewide importance.

## II. Analysis

Two questions are presented for our review: (1) whether this lawsuit presents a justiciable case or controversy and (2) if justiciable, whether a temporary injunction was warranted.

### A. *Justiciability*

The Declaratory Judgment Act allows a plaintiff to seek, and Kentucky courts to issue, a declaration of rights when an "actual controversy" exists. KRS 418.040. Specifically, that Act states:

> In any action in a court of record of this Commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists, the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a binding declaration of rights, whether or not consequential relief is or could be asked.

An actual, justiciable controversy is "a condition precedent to an action under our Declaratory Judgment Act." *Freeman v. Danville Tobacco Bd. of*

5

*Trade, Inc.*, 380 S.W.2d 215, 216 (Ky. 1964). *See also* Ky. Const. § 112(5) (limiting circuit court jurisdiction to "justiciable causes"). Plaintiffs who have standing to seek a declaration of rights include "[a]ny person . . . whose rights are affected by statute[.]" KRS 418.045.

Constitutional standing is an essential element of a justiciable case or controversy. *Commonwealth Cabinet for Health & Fam. Servs., Dep't for Medicaid Servs. v. Sexton ex rel. Appalachian Reg'l Healthcare, Inc.*, 566 S.W.3d 185, 196 (Ky. 2018). Indeed, "all Kentucky courts have the constitutional duty to ascertain the issue of constitutional standing, acting on their own motion, to ensure that only *justiciable causes* proceed in court[.]" *Id.* at 192. Constitutional standing is "defined by three requirements: (1) injury, (2) causation, and (3) redressability." *Id.* at 196. Specifically,

> A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. [A] litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent. . . . The injury must be . . . distinct and palpable, and not abstract or conjectural or hypothetical. The injury must be fairly traceable to the challenged action, and relief from the injury must be likely to follow from a favorable decision.

*Id.* (internal quotations and footnotes omitted). "If a case is not *justiciable,* specifically because the plaintiff does not have the requisite standing to sue, then the circuit court *cannot* hear the case." *Id.*

The Attorney General maintains that the Governor lacked standing to bring this lawsuit as he requests a non-justiciable advisory opinion and improperly seeks relief against legislative acts of the General Assembly, which

6

the Attorney General asserts are not appropriate subjects of injunctive relief. CR 65.01; CR 65.04. The Attorney General argues that the only provision of the challenged legislation applicable to him, the suspension power of S.B. 1 (which gives the Attorney General authority to approve, or disapprove, any suspension of statute deemed necessary by the Governor to respond to an emergency) is a legislative function that per Section 15 of the Kentucky Constitution[12] can be delegated by the legislature to other parts of government to exercise that power. The Attorney General points to this Court's repeated recognition that "when the General Assembly expressly grants to another branch the power to suspend a law, that branch constitutes the General Assembly's authority for purposes of Section 15 and that branch's execution of a suspension of the laws does not violate Section 15." *Commonwealth ex rel. Beshear v. Bevin*, 575 S.W.3d 673, 679 (Ky. 2019) (citing *Lovelace v. Commonwealth*, 285 Ky. 326, 336, 147 S.W.2d 1029, 1034–35 (1941)). Accordingly, the Attorney General maintains that the legislature's duly-enacted constraint on the Governor's ability to suspend statutes does not constitute an invasion of a constitutional right so as to confer standing since if that were the case, the Governor would have standing to sue to prevent the General Assembly from repealing or amending laws that he likes, or sue to make it pass bills he wants.

---

[12] Section 15 of the Kentucky Constitution states, "No power to suspend laws shall be exercised unless by the General Assembly or its authority."

7

The Attorney General further asserts that no injury has occurred, pointing out that the challenged legislation does not prevent the Governor from responding to emergencies; it simply requires him to work collaboratively with other officials—including the legislature—in situations involving long-term emergencies. Not only is there no injury, the Attorney General argues that he certainly did not *cause* any injury to the Governor since the complained-of legislation was not enacted by him. *See Sexton*, 566 S.W.3d at 196 (holding that an injury must be "fairly traceable to the defendant's allegedly unlawful conduct" to create standing).

With regards to redressability, the Attorney General contends that the injunction issued by the trial court did not redress anything, as it did not restrain him or mandatorily direct him to do anything, as is required by a proper injunction. *See, e.g., Commonwealth v. Mountain Truckers Ass'n, Inc.*, 683 S.W.2d 260, 263 (Ky. App. 1984) (requiring that injunctions "describe in reasonable detail the act to be restrained[]"); *see also* CR 65.01 (injunctive relief can only "restrict or mandatorily direct the doing of an act[]"). Therefore, the Attorney General argues that the Governor's alleged injury clearly cannot be redressed by any relief ordered against the Attorney General.

In response, the Governor maintains that he has constitutional standing to bring this suit because the General Assembly violated Section 69 of the

Kentucky Constitution[13] by delegating veto control to the Attorney General over the exercise of constitutionally-protected emergency powers that reside and remain with the Governor. Because S.B. 1 gives the Governor authority to suspend statutes but makes it contingent upon the Attorney General's approval, the Governor asserts he has standing to seek a temporary injunction enjoining the Attorney General from possessing or exercising this veto power over his exercise of emergency authority. The Governor further argues that this right is present: under S.B. 1, the Attorney General can exercise his veto right during an emergency and the Commonwealth was and is currently under a declared state of emergency. The Governor maintains that he need not wait until the Attorney General exercises his veto power since whether the Attorney General's approval can be required at all is the justiciable controversy, regardless of whether the Attorney General has yet to exercise veto authority.

As to causation, the Governor contends the Attorney General caused him injury when he assumed authority to veto the Governor's exercise of emergency authority. On redressability, the Governor contends that the trial court resolved this matter by staying implementation of the challenged legislation pending an adjudication on its constitutionality and enjoining the Attorney General from implementing or enforcing the suspension provision of S.B. 1.

---

[13] Section 69 of the Kentucky Constitution states that "[t]he supreme executive power of the Commonwealth shall be vested in a Chief Magistrate, who shall be styled the 'Governor of the Commonwealth of Kentucky.'"

In support, the Governor directs us to *Board of Education v. Bushee*, 889 S.W.2d 809 (Ky. 1994), a declaratory judgment action involving a clash between the legislature's delegation of authority to local school councils to "set school policy consistent with district board policy" and a Boone County Board of Education policy that required school councils to submit "for Board review and *approval*" a plan containing measurable goals and objectives for the upcoming school year. *Id.* at 810. Thus, the clash in *Bushee* involved the statutory delegation of certain authority to school councils and the Board of Education's policy that would have removed that authority. This Court held that the Boone County Board of Education's new policy of requiring its approval of certain plans submitted by local school councils presented a justiciable controversy, even though no such plan had yet been submitted for approval, since the Board's decision to approve or disapprove a particular policy or request had no impact on question of whether Board approval could be required at all. *Id.* at 811. The *Bushee* court noted that in a declaratory judgment action, this Court has long recognized that "the question is not one of a present controversy as contended by the Board, but rather whether there is a '*justiciable controversy* over present rights, duties or liabilities.'" *Id.* (quoting *Dravo v. Liberty Nat. Bank & Trust Co.*, 267 S.W.2d 95, 97 (Ky. 1954) (emphasis added)). "This is so although the effect of the judgment is prospective." *Id.* (quoting *Dravo*, 267 S.W.2d at 97).

The Attorney General distinguishes *Bushee* on grounds that the case at bar deals with a grant of authority from the General Assembly and a

10

subsequent alteration of that grant of authority by the General Assembly, rather than conflicting applicable rules or a conflict between governmental bodies. In other words, this case involves a statutory amendment by the one body authorized to amend the statute. But really, the conflict here is between the Governor's claimed executive authority under Section 69 and the legislature's authority per Section 15 to suspend statutes and delegate that suspension power to an agent such as the Attorney General.

The Attorney General further distinguishes *Bushee* on the basis that the parties in that case were on a collision course involving a concrete dispute with an impending deadline that could not be avoided. Here, the Attorney General argues that whether there will ever be a conflict is purely speculative and abstract. While a plaintiff might not have to incur harm before seeking a declaratory judgment, the Attorney General emphasizes that "[a] threatened injury must be 'certainly impending.'" *Commonwealth v. Bredhold*, 599 S.W.3d 409, 417 (Ky. 2020) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

However, the act of the Attorney General approving or disapproving the Governor's suspension of a statute has no effect on whether the General Assembly could lawfully require the Attorney General's approval in the first place. Thus, the Governor was not required to wait to file suit until the Attorney General invoked his veto power. *See Commonwealth v. Ky. Ret. Sys.*, 396 S.W.3d 833, 839 (Ky. 2013) (holding that "[t]he [Declaratory Judgment] Act allows courts to determine a litigant's rights before harm occurs, and requires the existence of an actual controversy. Such a controversy occurs when a

11

defendant's position would 'impair, thwart, obstruct or defeat plaintiff in his rights[]'") (quoting *Revis v. Daugherty,* 215 Ky. 823, 287 S.W. 28, 29 (1926)). *See also Jamgotchian v. Ky. Horse Racing Comm'n*, 488 S.W.3d 594, 600 (Ky. 2016) (holding that the plaintiff, a licensed owner in good standing to claim horses, was not required to wait until being sanctioned by the Commission before seeking a declaration as to the constitutionality of Kentucky's claiming regulations); *Jarvis v. Nat'l City*, 410 S.W.3d 148, 153 (Ky. 2013) (explaining that a declaratory judgment action allows persons within, or arguably within, the scope of a statute "to have their rights and obligations [under the statute] declared without being forced to act improperly and initiate litigation after an injury has occurred[]"); *cf. Foley v. Commonwealth*, 306 S.W.3d 28 (Ky. 2010) (upholding denial of movant's declaration that Kentucky's self-defense statutes were unconstitutional, finding no justiciable case or controversy since the challenged self-defense statutes had no foreseeable application to the movant).

We find the present case more analogous to *Jamgotchian* and *Jarvis* than *Foley*. Whether the Governor's emergency power in this situation is statutorily or constitutionally derived is at the heart of the Governor's Complaint and thus presents a justiciable case or controversy.[14]

---

[14] As an aside, and while this analysis has focused on S.B. 1, the trial court enjoined enforcement of three other pieces of the 2021 legislation, H.B. 1, S.B. 2. and H.J.R. 77. Currently before this Court are two other cases, *Beshear v. Goodwood Brewing Co.*, 2021-SC-0126-I (Scott Circ. Ct., No. 21-CI-000128), and *Beshear v. Ridgeway Props., LLC*, 2021-SC-0228 (Boone Circ. Ct., No. 20-CI-00678). In each of these cases, the Attorney General, either as a party or amicus curiae, is arguing in support of the constitutionality of the 2021 legislation and against the Governor.

### B.  *Temporary Injunction Not Warranted*

To justify the grant of a temporary injunction, a plaintiff must satisfy the following, well-recognized requirements:

> First, the trial court should determine whether plaintiff has complied with CR 65.04 by showing irreparable injury. This is a mandatory prerequisite to the issuance of any injunction. Secondly, the trial court should weigh the various equities involved.  Although not an exclusive list, the court should consider such things as possible detriment to the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo.  Finally, the complaint should be evaluated to see whether a substantial question has been presented.  If the party requesting relief has shown a probability of irreparable injury, presented a substantial question as to the merits, and the equities are in favor of issuance, the temporary injunction should be awarded.  However, the actual overall merits of the case are not to be addressed in CR 65.04 motions.

*Maupin v. Stansbury*, 575 S.W.2d 695, 699 (Ky. App. 1978).

With respect to our review of the trial court's analysis under *Maupin*, generally, "a party seeking interlocutory relief from a trial court's decision to grant or deny a temporary injunction bears an enormous burden.  And an appellate court may not disturb a trial court's decision on a temporary injunction unless the trial court's decision is a clear abuse of discretion." *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 162 (Ky. 2009) (internal quotations and footnotes omitted).  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (quoting *Commonwealth v. English*, 993 S.W.2d 942, 945 (Ky. 1999)).  Notably, "[a] motion for a

13

temporary injunction does not call for, or justify, an adjudication of the ultimate rights of the parties. . . . [and] should issue only where it is clearly shown that one's rights will suffer immediate and irreparable injury pending trial." *Id.* at 161 (internal quotations and citations omitted). On appellate review, however, the appellate court may properly determine that findings are clearly erroneous if they are . . . occasioned by an erroneous application of the law. *Rogers v. Lexington-Fayette Urb. Cnty. Gov't,* 175 S.W.3d 569, 571 (Ky. 2005). In this instance, we find that the trial court's issuance of injunctive relief was unsupported by sound legal principles occasioned by an erroneous application of the law.

To obtain an injunction, the Governor was required to show a probability of irreparable injury, present a substantial question as to the merits of his Complaint, and persuade the court that the equities balanced in favor of issuance.

### 1. **Irreparable Injury.**

Regarding irreparable injury, the Governor's argument essentially centers on the harm to his ability to protect the public during a global pandemic, and the claimed harm to the constitutional power and authority of his office. We emphasize that in our following discussion and analysis we do not question the Governor's good faith in taking steps he believes are necessary in dealing with the pandemic.[15] That noted, underlying consideration of all our COVID

---

[15] We similarly do not question the good faith of the General Assembly in enacting the 2021 legislation.

14

decisions, as aptly stated by Justice William O. Douglas, "no doubt that the emergency which caused the [executive to take action] was one that bore heavily on the country. But the emergency did not create power; it merely marked an occasion when power should be exercised." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 629 (1952) (Douglas, J., concurring). Over the last forty years, this Court has been explicit that the Governor's powers, except in a limited number of instances expressly set forth in the Constitution, derive from statutes passed by the General Assembly. *See, e.g., Commonwealth ex rel. Beshear v. Commonwealth ex. rel. Bevin,* 498 S.W.3d 355, 369 (Ky. 2016) (stating "the Governor . . . is bound by the law[]"); *Fletcher v. Commonwealth ex rel. Stumbo,* 163 S.W.3d 852, (Ky. 2005) (rejecting Governor's claim of implied authority to expend unappropriated funds to provide essential services in an emergency); *Brown v. Barkley,* 628 S.W.2d 616, 621 (Ky. 1982) (detailing the seven sections of our Commonwealth's constitution expressly conferring powers and duties on the Governor).[16] In fact, in *Brown,* we held that "to the extent that the Governor has any implied or inherent powers in addition to those the Constitution expressly gives him, it seems clear that such unexpressed executive power is subservient to the overriding authority of the legislature[.]" 628 S.W.2d at 621.

---

[16] In brief, these powers and duties are to serve as commander-in-chief of military forces and affairs of the state, Ky. Const. § 75; fill vacancies in office, except as otherwise provided by the Constitution, Ky. Const. § 76; exercise pardon power, Ky. Const. § 77; require written information from Executive branch officers, Ky. Const. § 78; report on the state of the Commonwealth and recommend measures to the General Assembly, Ky. Const. § 79; call the General Assembly into special session, Ky. Const. § 80; and "take care that the laws be faithfully executed[.]" Ky. Const. § 81.

15

In *Fletcher*, we approvingly quoted the following,

> The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted. They knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies.
>
> . . .
>
> [E]mergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them.
>
> . . .
>
> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.

*Fletcher,* 163 S.W.3d at 871 (quoting *Youngstown*, 343 U.S. at 646, 649–50, 652, 655 (Jackson, J., concurring)).

Another rule of interpretation is that we "'presum[e] that the challenged statutes were enacted by the legislature in accordance with constitutional requirements.'" *Acree*, 615 S.W.3d at 805 (quoting *Cornelison v. Commonwealth*, 52 S.W.3d 570, 572 (Ky. 2001)). "A constitutional infringement must be 'clear, complete and unmistakable' in order to render the statute unconstitutional." *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 806 (Ky. 2009) (quoting *Ky. Indus. Util. Customers, Inc. v. Ky. Utils. Co.*, 983 S.W.2d 493, 499 (Ky. 1998)). Considering that the General Assembly is the policy-making body for the Commonwealth, not the Governor or the courts, equitable considerations support enforcing a

16

legislative body's policy choices. In fact, non-enforcement of a duly-enacted statute constitutes irreparable harm to the public and the government. *See Boone Creek Props., LLC v. Lexington-Fayette Urb. Cnty. Bd. of Adjustment*, 442 S.W.3d 36, 40 (Ky. 2014) (holding that the statute's enactment constitutes an implied finding by the legislature that the public interest required it). Whether the Governor has shown an irreparable injury is tied to his constitutional claims and the likelihood of success.

## 2. **Substantial Questions on the Merits.**

As to the potential for success on the merits of the Governor's Complaint, the extent of the Governor's exercise of emergency authority during the COVID-19 pandemic is confined to the statutory authority given to him by the legislature under KRS Chapter 39A. *Acree*, 615 S.W.3d at 812–13. Indeed, in *Brown v. Barkley*, this Court clarified:

> [T]o the extent that the Governor has any implied or inherent powers in addition to those the Constitution expressly gives him, it seems clear that such unexpressed executive power is subservient to the overriding authority of the legislature, and . . . the officers named in Const. Sec. 91 have only such powers and duties as are assigned to them by legislative enactment or by executive order expressly authorized by statute.

628 S.W.2d at 621 (holding that the Governor did not have constitutional power to issue an executive order to reorganize agencies when not authorized by the enabling statute and a related statute pursuant to which the order was issued). Further,

> Whereas the judicial branch must be and is largely independent of intrusion by the legislative branch, the executive branch exists principally to do its bidding. The real power of the executive branch springs directly from the long periods between legislative

17

sessions, during which interims the legislature customarily has left broad discretionary power to the chief executive.

*Id.* at 623.

"Practically speaking, except for those conferred upon him specifically by the Constitution, [the Governor's] powers, like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him." *Id.* Thus, the Governor has no implied or inherent emergency powers beyond that given him by the legislature, who, as elected officials, serve at the behest of the Commonwealth.[17]

a. Separation of Powers.

The trial court found serious separation of powers issues under Sections 27 and 28, the constitutional provisions that mandate that strict separation of powers under our tripartite government, citing *Legislative Research Commission ex rel. Prather v. Brown*, 664 S.W.2d 907 (Ky. 1984). The trial court stated,

> The legislature has every right, and even the duty, to adopt standards and rules to govern the Governor's exercise of emergency executive authority. But when the legislative role shifts from oversight and policymaking to micromanagement of administrative rules and orders there is a clash that implicates the separation of powers provisions of sections 27 and 28 of the Kentucky Constitution. *See Legislative Research Commission v. Brown*, 664 S.W.2d 907 (Ky. 1984). The challenged legislation here—HB1, SB 1 and SB 2—all raise serious separation of powers issues.

---

[17] Any claim of the Governor regarding his authority as commander-in-chief, under Section 75, is similarly unavailing. "That military powers of the Commander-in-Chief were not to supersede representative government of internal affairs seems obvious from the Constitution and from elementary American history." *Youngstown*, 343 U.S. at 644 (Jackson, J., concurring).

18

Order Granting Temporary Injunction Under CR 65.04, No, 21-CI-00089 (Franklin Circ. Ct. Mar. 3, 2021). This reliance on *L.R.C. v. Brown* is misplaced.

The precise issue in *Brown* was occasioned by the then statutory provisions that purported to give the General Assembly authority, through the L.R.C., to review and void executive branch administrative regulations. We held this review process was unconstitutional either as a legislative veto or as an impermissible extension of the legislative session.

By contrast, the current legislative review of administrative regulations is set forth in KRS Chapter 13A. Specifically, legislative committees may review new, emergency or existing regulations and, among other decisions, make determinations that the regulations are deficient. KRS 13A.030. Prior to S.B. 2, the statute referred to "nonbinding determinations." The trial court commented on the change to the statutory language in S.B. 2 that deleted the word "nonbinding" from the statute. S.B. 2 § 2(2). As a rule of construction, courts generally presume that statutory amendment is made with a view to change the law. *Jefferson Cnty. Bd. of Educ. v. Fell*, 391 S.W.3d 713, 724 (Ky. 2012). In *Fell*, however, we also noted the overarching consideration is to discern legislative intent:

> As important as it is for a court to scrutinize the particular statute *in toto*, our statutory construction principles also mandate considering the statute in context with other statutes surrounding it. *Petitioner F.*, 306 S.W.3d at 85–86 (statutory enactment to be read as a whole and also in context with other parts of statute). This comes as no surprise because given that the cardinal rule of

19

> statutory construction is discerning legislative intent, it is entirely logical for the judiciary to see what else our General Assembly has said on the particular topic underlying the controversy.

*Id.* at 721-22. Notwithstanding the deletion of the word "nonbinding," our review of KRS Chapter 13A reveals that even though a legislative committee may find that a regulation is "deficient," the regulation at issue remains in the purview of the executive branch as to what is to become of the "deficient" regulation. *See* KRS 13A.330 (vesting Governor with final authority as to whether a "deficient" administrative regulation shall be withdrawn, amended, or become effective notwithstanding deficiency). Section 17 of S.B. 2 amends KRS 13A.330 principally to include reference to emergency administrative regulations. The Governor's final say over the disposition of any "deficient" emergency regulations remains intact.

Because the executive branch retains final say as to administrative regulations, the 2021 legislation does not violate Sections 27 and 28, or this court's holding in *L.R.C. v. Brown.* If the trial court's conclusion was based on what it termed the General Assembly's "micromanagement" of state government, the simple answer, of course, is that it did so during its constitutionally authorized annual session, and not during an out-of-session committee hearing. As we have noted time and again, so many times that we need not provide citation, the General Assembly establishes the public policy of the Commonwealth.

20

b. Power to Call Special Sessions.

The Governor argues that the legislation at issue requires him to call the legislature into session every thirty days in order for him to continue to exercise his emergency powers.  S.B. 1 §2(2)(a).  In other words, the Governor claims the General Assembly infringes on his exclusive authority to call it into special session. Ky. Const. § 80.

Since 1942, special sessions have been called 52 times.[18]  No doubt each involved some matter that the then-Governor believed could not wait for the regular session of the General Assembly.  In a word, an emergency not theretofore addressed by the statutes.  Typically, the remedy, as for all governors over the past 130 years of the 1891 Constitution, is to do the hard work of consulting with the General Assembly and agreeing on statutory amendment in advance of a special call.  The General Assembly, as well as the Governor, are trustees of the Commonwealth's welfare.  *See Youngstown*, 343 U.S. at 629 (Douglas, J., concurring) (stating "[t]he Congress, as well as the President, is trustee of the national welfare[]").  Recent experience demonstrates the futility of calling a special session without that advance work.[19]  Furthermore, the assertion that the Governor would be forced to call a special session every 30 days is not credible.  H.J.R. 77 extended emergency measures anywhere from 30 to 90 days.  In the future, depending on the

---

[18] https://legislature.ky.gov/Law/Statutes/Pages/KrsExtraOrdList.aspx (last accessed Aug. 16, 2021).

[19] In 2018, Governor Bevin called a special session to address the pension crisis that lasted two days and without any legislation passed.

21

circumstances, nothing prohibits the Governor and General Assembly from agreeing on emergency powers in excess of 30 days.

These items noted, we do not believe this issue has been adequately addressed by the parties and therefore make no definitive pronouncement concerning the constitutionality of thirty-day limitation contained within the 2021 legislation.

c. Power to Suspend Statutes

The Governor argues that S.B. 1 § 4 infringes on his supreme executive authority by placing ***his*** authority to suspend statutes under the veto power of the Attorney General. Ky. Const. § 69; *Barkley*, 628 S.W.2d at 624. Again, we disagree.

The power to suspend statutes does not belong to the Governor. It belongs to the General Assembly. Ky. Const. § 15. This section is especially succinct and clear: "[n]o power to suspend laws shall be exercised unless by the General Assembly or its authority." In fact, the drafters of our Constitution deemed this provision so important, they placed it in the Bill of Rights:

> Since this provision is a part of the Bill of Rights, the Governor could not suspend statutes even if he possessed "emergency" or "inherent" powers under Sections 69 and 81. Ky. Const. § 26 ("To guard against transgression of the high powers which we have delegated, We Declare that everything in this Bill of Rights is excepted out of the general powers of government ...."). The suspension of statutes by a Governor is also antithetical to the constitutional duty to "take care that the laws be faithfully executed." Ky. Const. § 81.

*Fletcher*, 163 S.W.3d at 872. From this, we conclude that the power to suspend statutes ought to be exercised judiciously, soberly and upon due consideration.

*Barkley* is instructive in this regard, but not as the Governor argues. Under Section 15, the General Assembly might grant the Governor the power to suspend statutes. Or, it properly might grant that power to the Attorney General. *See Barkley*, 628 S.W.2d at 621 (stating "the officers named in [Section] 91 have only such powers and duties as are assigned to them by legislative enactment or by executive order expressly authorized by statute[]"). In *Barkley*, we recognized the Constitution framers created these independent, statewide-elected officers to "provide convenient receptacles for the diffusion of executive power." *Id.* at 622. Given the importance of the power to suspend laws, we see no valid reason why the General Assembly might not properly grant the power to two independently-elected constitutional officers.

The Governor argues that the immediately following sentence in *Barkley* supports his argument that by doing so, the General Assembly has impermissibly "create[d] another executive officer or officers who will not be subject to [the Governor's] supremacy[.]" *Id.* The complete quotation is

> As the Governor is the "supreme executive power," it is not possible for the General Assembly to create another executive officer or officers who will not be subject to that supremacy, but **it definitely has the prerogative of withholding executive powers from him by assigning them to these constitutional officers who are not amenable to his supervision and control.**

23

*Id.* (emphasis added).[20]  S.B. 1 § 4 constitutes a valid exercise of the General Assembly's authority to suspend statutes.

### d. Arbitrary Legislation

The trial court expressed that the 2021 legislation "presents questions as to whether the thirty-day limitation period for Executive Orders and [emergency regulations] are arbitrary under Section 2."  The Governor expands this concept by arguing the bills are arbitrary, vague and unenforceable, asserting the public's due process rights.  In our view, the Governor has no standing to assert the public's due process rights.  *See Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 60-61 (Ky. App. 1999) (holding that motor vehicle seller had no standing to claim certain regulations and statutes were arbitrary, void as vague, and violative of due process since it was not charged with violation of that regulation/statute, and no party then in the action had been so charged).[21]

---

[20] The Governor also cites *L.R.C. v Brown* in support of this argument.  This case did not address suspension of statutes, but the authority of the General Assembly, through the L.R.C., to disapprove administrative regulations while it, the General Assembly, was not in session.  We therefore fail to perceive the applicability of this case, unless it is for the proposition as to the executive powers and responsibilities lying within the province of the Governor.  664 S.W.2d at 919.  We hold that *Fletcher* and our analysis of Sections 15 and 91 are more directly on point.

[21] In *Commonwealth ex rel. Beshear v. Commonwealth ex. rel. Bevin*, 498 S.W.3d 355, 360-66 (Ky. 2016), we recognized that the Attorney General has standing as the chief legal officer of the state to vindicate public rights.  In the same case, we held that three individual legislators did not have that same standing because they were not the chief legal officer(s) for the public.  *Id.* at 367.  We similarly conclude as to the Governor's lack of standing in this case as to these claims.

24

e. Special Legislation

The Governor argues that the 2021 legislation is special legislation in violation of Sections 59 and 60. His argument is that these bills grant businesses, schools, local governments and others the authority or power to exercise discretion as to what health care guidance to follow, citing *Young v. Willis*, 305 Ky. 201, 204-05, 203 S.W. 2d 5, 7 (1947). Any argument that the 2021 legislation constitutes special legislation in violation of Kentucky Constitution § 59 is easily disposed of by our decision in *Calloway County Sheriff's Department v. Woodall*, 607 S.W.3d 557 (Ky. 2020). The legislature did not identify or single out any particular person, business, school, locality or entity to which the 2021 legislation would apply. *Id.* at 573. Instead, the legislation applies statewide.

We similarly reject the Governor's argument that Section 60,[22] and our predecessor court's decision in *Young,* compels a finding of unconstitutionality. The claim is that the 2021 legislation permits localities or any number of other entities to establish their own pandemic guidance. We again disagree. Our statutes are replete with many instances of localities, schools, businesses being

---

[22] In pertinent part, Section 60 provides,

No law, except such as relates to . . . public buildings or improvements, . . . matters pertaining to common schools, . . . and the regulation by counties, cities, towns or other municipalities of their local affairs, shall be enacted to take effect upon the approval of any other authority than the General Assembly, unless otherwise expressly provided in this Constitution.

25

permitted to make choices that conform to local conditions or individual choice. We see this legislation as no different.

### 3. Balancing Equities

The trial court made extensive findings concerning the COVID-19 pandemic, its ongoing nature, and the good occasioned by the Governor's emergency measures.[23] In balancing the equities, the trial court considered these facts, as well as its interpretation of the injury to the Governor's constitutional powers, juxtaposed with the 2021 legislation and the more localized approach to the pandemic that implementation of that legislation would entail. Our expression, however, in *Acree* that a global pandemic justified a statewide response, 615 S.W.3d at 808, in no way expressed or implied it was the sole method in dealing with the pandemic. In fact, we expressly held that the General Assembly could limit the Governor's statutorily-derived emergency powers should it wish to. *Id.* at 812–13. That noted, as we have discussed, the Governor's emergency powers derive from the statutes enacted by the General Assembly, not from our Constitution and not from his "inherent" powers. The trial court's findings substituted its view of the public interest for that expressed by the General Assembly. The fact that a statute is enacted "constitutes [the legislature's] implied finding" that the public will be harmed if the statute is not enforced. *Boone Creek Props.,* 442

---

[23] Additionally, we can take judicial notice that the Delta variant, and perhaps others, are raising positivity rates throughout the nation and Kentucky.

26

S.W.3d at 40. Thus, the public interest strongly favors adherence to the 2021 legislation.

### III.  Conclusion

The trial court emphasized that "[t]he Governor has alleged irreparable injury to his constitutional powers and made preliminary showing that the bills impair the exercise of his constitutional duty." As discussed, these findings are largely unsupported by sound legal principles because they are occasioned by erroneous interpretations of the constitutional authority of the Governor and law. As a result, we find that the trial court's issuance of injunctive relief was improper.

In sum, considering that the challenged legislation was lawfully passed, the Governor's Complaint does not present a substantial legal question that would necessitate staying the effectiveness of the legislation. And as the equities clearly favor implementation of the legislation pending an adjudication of its constitutionality, we conclude that the Franklin Circuit Court abused its discretion in finding otherwise. Thus, we remand this case to the Franklin Circuit Court with instructions to dissolve the injunction. This case is reversed and remanded to the Franklin Circuit Court for further proceedings consistent with this Opinion. In the event certain sections of the 2021 legislation may be ultimately found invalid, the likely remedy may be severability. KRS 446.090.

All sitting. All concur.

HUGHES, J., CONCURS BY SEPARATE OPINION IN WHICH MINTON, C.J., JOINS: I concur with the lead opinion's conclusion that a blanket

27

injunction essentially precluding enforcement of any of the 2021 legislation should not have issued in this matter. The Attorney General insists this case presents no justiciable controversy and, in my view, his point has legal merit despite the obvious serious disagreements among the parties regarding emergency powers. Moreover, with the passage of time, the expiration of executive orders and the absence of any enforcement measures that collide with the limitations in the 2021 legislation, we have (at least on the record before us) currently no specific real-world dispute about the application of any portion of H.B. 1, S.B. 1, S.B. 2 or H.J.R. 77. That said, the Governor has alleged unconstitutional encroachment on his emergency powers, and the seemingly relentless nature of the COVID-19 pandemic ensures that the issues he raises will continually resurface, leading to constant litigation and conflicting results from circuit courts across the Commonwealth. Last summer prior to *Beshear v. Acree*, 615 S.W.3d 780 (Ky. 2020), we invoked Kentucky Constitution Section 110 and took unprecedented action to combine and expedite cases so we could address the multiple challenges to the Governor's COVID-19 response. Recognizing all that has transpired, I am persuaded that in these unusual circumstances the lead opinion properly proceeds to the merits of the trial court's injunction. Simply put, the maelstrom will continue absent some direction from this Court. As I read the lead opinion, we address the Governor's substantive constitutional challenges in the context of this appeal of a temporary injunction to determine whether substantial questions on the merits have been raised, not to rule definitively on all issues presented.

28

This point bears emphasis because the Attorney General has not briefed in this Court, or in the trial court for that matter, the merits of the various constitutional challenges but has stood on his position that the case presents no justiciable controversy.

As we recognized in *Acree*, the Kentucky General Assembly granted specific emergency powers and authority to the Governor in KRS Chapter 39A and the legislature has the authority to restrict and expand those statutory powers. *Id.* Many of the challenged provisions of the 2021 legislation are within the legislature's domain, are entitled to the presumption of constitutionality, and should not be enjoined wholesale. For example, as the lead opinion aptly notes Section 15 of the Kentucky Constitution allows for the suspension of statutes "by the General Assembly or its authority." Consequently, the legislature can amend KRS 39A.180 to alter the manner in which statutes are suspended in an emergency. Similarly, the legislature may, as it did in H.B. 1, provide that businesses can operate in any emergency pertaining to a "virus or disease" under plans consistent with either the directives of the executive branch or applicable guidance from the Center for Disease Control. The Governor—and others for that matter—may question the efficacy and wisdom of that patchwork approach but that is a policy decision that our legislature can make by duly-passed statute and neither the executive nor the judiciary can reject it outright on "best practices" grounds. In sum, passing generally applicable laws that provide the framework for governmental action in the Commonwealth is the legislature's prerogative. Thus, I do not

29

believe a substantial question on the merits was presented as to those parts of the 2021 legislation that were within the legislature's law-making authority.

That said, in *Acree* this Court did not conclude that all emergency powers are lodged solely in the legislature. Emergency powers are not expressly mentioned in our state Constitution but we discerned "[t]he implied tilt of the Kentucky Constitution toward executive powers in time of emergency . . . given our government's tripartite structure with a legislature that is not in continuous session." *Id.* at 806. We noted that the Kentucky Constitution provides the framework for the three branches and the exercise and separation of their respective powers. *Id.* at 805. The executive branch is charged with the "supreme executive power of the Commonwealth," Kentucky Constitution Section 69, and authorized to administer state government year-round, just as the judicial branch is in session year-round to perform the judicial function of interpreting and applying the law. The legislature is not in year-round session but, to the contrary, has carefully circumscribed legislative sessions. Kentucky Constitution Sections 36 and 42 limit the legislature to sixty-day sessions ending no later than April 15 in even numbered years and to thirty-day sessions ending no later than March 30 in odd-numbered years. The legislature has no power to call itself into session at any other time but the Governor may exercise his discretion to do so under Section 80 on "extraordinary occasions." This constitutional structure led to our observations and conclusion about the power and necessity of the executive branch to act in managing an emergency. We concluded that "[f]ortunately, the

30

need to definitively label the powers necessary to steer the Commonwealth through an emergency as either solely executive or solely legislative is largely obviated by KRS Chapter 39A . . . which reflects a cooperative approach between the two branches." *Id.* at 809. Regrettably, recent events have strained that cooperative approach.

Historically, the Governor and various agencies of the executive branch including the Cabinet for Health and Family Services and the Division of Emergency Management have managed emergencies on a day-to-day, evolving basis, relying on the statutory guidelines provided by the legislature and executive branch administrative expertise. The executive branch has acted through the Governor's issuance of executive orders and various emergency administrative regulations. The legislature's emergency management involvement has been confined to the exercise of its traditional law-making function. Thus, during the 2020 and 2021 legislative sessions the General Assembly passed laws addressing various COVID19 emergency issues, approving and supplementing some of the Governor's directives while limiting and discontinuing others. The 2021 legislation extends the legislature's reach and control beyond the laws passed in the constitutionally-mandated sessions, curtailing the Governor's powers through a thirty-day limit on the exercise of his emergency authority. The thirty-day limit operates as a "kill switch" that essentially transfers the day-to-day management of emergencies to the legislature by rendering the executive branch powerless to act after thirty days, forcing the call of a special legislative session. This type of special legislative

31

session trigger has no antecedent in Kentucky law to my knowledge and requires careful constitutional analysis. Is it consistent with our current constitutional framework? Can the legislature pass a law that *de facto* nullifies the Governor's constitutionally-granted discretion regarding the calling and content of special legislative sessions and forces their recall, perhaps repeatedly as an emergency evolves over many months?[24]

This concept of time-limited executive emergency authority that relies on the recall of the legislature into special session appears throughout the 2021 legislation, raising serious constitutional questions that require further focused examination. The Attorney General, maintaining that no justiciable controversy exists, has not engaged on this or any other merits issues; the trial court needs the benefit of legal analysis from both sides. The lead opinion wisely recognizes that on remand the circuit court should address this issue and I wholeheartedly agree.

In closing, 7,477 Kentuckians have lost their lives to COVID-19 as of August 19, 2021. That number is considerably higher than the entire population of my Western Kentucky hometown and the cities where many Kentuckians live and work. The death toll does not even account for the

---

[24] The 2021 Session passed H.B. 4 which will place on the 2022 general election ballot a proposed amendment to the Kentucky Constitution allowing the President of the Senate and the Speaker of the House to convene the legislature by Joint Proclamation "for no more than twelve legislative days annually." If Kentucky voters approve, this amendment would put the imprimatur of our Constitution on the convening of the General Assembly beyond the current constitutionally-authorized annual sessions and the "extraordinary circumstances" special sessions called at the discretion of the Governor under Section 80.

hundreds of thousands of citizens whose lives have been irrevocably changed by the impact of the disease on their own lives, their families and their communities. And still the COVID-19 scourge continues with coronavirus cases and hospitalizations increasing these past few weeks. Whatever disagreements citizens may have about how best to address the seemingly limitless thorny issues raised by the pandemic, they are undoubtedly united in their desire to see our Commonwealth travel as safely and quickly as possible to the other side, to find some semblance of normal again. As a Justice, and more pertinently as a lifelong Kentuckian, I implore all parties to this matter to lay down their swords and work together cooperatively to finish this immensely important task for the benefit of the people they serve.

COUNSEL FOR MOVANT, ATTORNEY GENERAL:

S. Chad Meredith
Matthew F. Kuhn
Brett R. Nolan
Office of the Attorney General


COUNSEL FOR RESPONDENT, GOVERNOR:

Amy D. Cubbage
S. Travis Mayo
Taylor Payne
Marc Farris
Laura C. Tipton
Office of the Governor


COUNSEL FOR RESPONDENT, SECRETARY
FRIEDLANDER:

Wesley W. Duke
LeeAnne Applegate
Cabinet for Health and Family Services


COUNSEL FOR ROBERT STIVERS, AS PRESIDENT
OF THE KENTUCKY SENATE:

David E. Fleenor


COUNSEL FOR DAVID OSBORNE, AS SPEAKER
OF THE HOUSE OF REPRESENTATIVES:

David E. Lycan


COUNSEL FOR LEGISLATIVE RESEARCH COMMISSION:

Gregory A. Woosley